[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff commenced this summary process action seeking a judgment of possession of the premises known as 653-655 Bank Street in New London, Connecticut.
On February 14, 2000, the parties entered into a written lease whereby the plaintiff rented said premises to the defendant for a period of three years.
The defendant, who agreed to operate her restaurant and catering business at 653-655 Bank Street, took possession on February 15, 2000 and continues to occupy those premises.
The lease provided that the defendant was to pay the plaintiff monthly rental in the amount of $1,100.00 per month on the 15th day of each month.
In his complaint, the plaintiff alleges that the defendant failed to pay the rent that was due on December 15, 2000. He also alleged that the defendant has operated the premises "primarily as a night club," in violation of the lease provision that she use the Bank Street property for her restaurant and catering business.
On December 28, 2000, the plaintiff served a notice to quit on the CT Page 11366 defendant alleging both of the aforementioned grounds for eviction. The court record indicates that the notice to quit was properly served.
On January 25, 2001, the plaintiff initiated this action by serving a copy of the writ summons and complaint upon the defendant. The return date in this action was February 6, 2001.
The defendant appeared through counsel on February 8, 2001. After the plaintiff filed a revised complaint on February 21, 2001, the defendant filed an answer and eight special defenses on March 1, 2001. The court finds that there was appropriate service and notice, and that it has jurisdiction in this matter.
A trial was held before the undersigned on the following dates: April 24, 2001; April 25, 2001; April 26, 2001; May 1, 2001; May 2, 2001 and May 4, 2001. At the conclusion of evidence and testimony, counsel requested and received additional time to submit post. trial memoranda. The plaintiff's brief was filed on May 29, 2001 and the defendant's submission was received on the following day.
The court has carefully considered all the evidence introduced at trial, as well as the written and oral arguments of counsel.
 Factual Findings
The following facts were proven by a preponderance of the evidence at trial. Paragraph 5 of the lease provides that: "The tenant has examined the demised premises and accepts them in their present condition [except as otherwise expressly provided herein] and without any representations on the part of the Landlord or its agents as to the present or future condition of the said premises." [Plaintiff's Ex. 2.]
The defendant secured $50,000 financing from the Community Economic Development Fund [CEDF] in order to start her business. To help facilitate the defendant's negotiations with CEDF, the plaintiff removed the property from the rental market from October 1999 until the lease was signed in February 2000.
Prior to signing the lease, the defendant, her contractors, and a representative from the CEDF inspected 653-655 Bank Street. On one occasion prior to taking occupancy, the defendant observed water damage at the premises, which had been caused by broken pipes. This condition was repaired by the landlord prior to execution of the lease.
The defendant was represented by counsel at the lease signing. An attorney for the CEDF was also in attendance. The defendant utilized the CT Page 11367 $50,000 loan to renovate the premises and to pay the bills of various suppliers. Assisted by family members, the defendant worked to prepare the building from mid-February until the end of March. The defendant used space heaters and commercial blowers to heat the building during the renovation work. The restaurant opened for business on March 31, 2000.
The following summer, during July or August, there were several occasions when the restaurant's roof leaked during heavy downpours.
The defendant contacted the plaintiff, who sent John Madden, a contractor, to the building. At the plaintiff's expense, Madden installed flashing and performed other repairs to remedy the problem. There has been no further roof leakage since Madden completed that work.
The defendant experienced another problem when water seeped into the premises through the cellar door. The defendant rectified that situation by building a tempered floor over the damp area. The plaintiff agreed to pay for those repairs. The defendant also experienced a sewer backup, which was apparently caused by grease from the restaurant. The defendant paid a plumber to correct that problem.
In seven of the eight special defenses filed in this matter (see Special Defenses 2-8) the defendant alleged that "the persistent leakage of water" and insufficient heat interfered with her use of the subject premises and/or disrupted her business operations. The defendant's claims concerning lack of heat will be dealt with at length below.
However, the court finds that the defendant failed to prove by a preponderance of the evidence all of the special defenses related to water leakage. The evidence here established that the instances of water leakage were isolated, and caused relatively minimal disruption of the defendant's business. The plaintiff promptly hired a contractor to fix the problem, and there have been no further roof leaks for approximately one year.
In August 2000, the plaintiff initiated a summary process action against the defendant for alleged nonpayment of rent. That matter was subsequently withdrawn and resolved by agreement of the parties. As part of that agreement, the plaintiff and defendant signed an amended lease on November 9, 2000. The emended lease specified the application of advance rental payments previously made by the defendant to the plaintiff. The amended lease also included the following language: "The landlord shall have no liability to tenant nor shall tenant's covenants and obligations under this lease be reduced or abated in any manner whatsoever by reason of any inconvenience, annoyance, interruption or injury to business arising out of any obligation of landlord pursuant to this lease. CT Page 11368 Landlord shall nevertheless use its best efforts to minimize any interference with tenant's business in the premises."
The defendant paid the rent that was due on November 15, 2000. In November 2000, the defendant noticed that the building was cold during business hours. The subject premises, which have been used as a restaurant since the 1980's, consist of approximately 3,500 square feet.
The defendant adjusted thermostats in the restaurant to increase the level of heat. When this failed to produce the desired results, the defendant contacted a contractor to fix the heating system. The defendant testified that when the contractor came to the premises, she learned that the only heating source in the restaurant was an eight-foot long electric baseboard located in the dining area. The defendant's attorney contacted the plaintiff [who is also a lawyer] about the frigid conditions and lack of heating apparatus in the building. On November 30, 2000, the plaintiff sent a facsimile message to defendant's counsel [see Defendant's Ex. A]. In that communication, the landlord stated:
 "To solve the heating problem, I will have a contractor on the premises on Monday at 3:00. Any problem, get back to me." [Defendant's Ex. A.]
The plaintiff sent Henry Douton, a plumbing and heating contractor, to the Bank Street property. Douton suggested that he could install an electric ceiling heater in the building to supplement the existing system. The work proposed by Douton would cost the plaintiff approximately $1,000.00.
On December 8, 2000, the defendant's counsel wrote to the plaintiff. He included a proposal from Hodge Plumbing and Heating, a contractor selected by the defendant. Hodge proposed to install a "new warm air heating system" at a total cost of $15,390.00 [Defendant's Ex. B]. In the transmittal letter under date of December 8, 2000, the defendant's counsel stated:
 "Attached, please find the proposal from a heating consultant Jacqui Riddle procured. I am forwarding it to you as you requested. Jacqui has advised me that she is losing customers due to lack of heat. Please let me know what your plans are. Thank you." (Defendant's Ex. B.]
The plaintiff responded with a letter dated December 12, 2000. (Defendant's Ex. F.] In that communication, the plaintiff rejected the proposal made by Hodge Plumbing and Heating and cited the "as is" CT Page 11369 provisions of the lease. He withdrew his offer to have Douton install a supplemental heating source. The plaintiff wrote:
 "As you know I offered to install the same type of heating unit in the rear dining room as is installed in the front dining room. I had the contractor who installed the existing unit inspect the premises for those purposes and I was prepared to install a heating system at my expense on that limited basis. I did so in an attempt to accommodate your client, however, I fully recognize that I had no liability to do so and that if in fact an additional heating system is needed that would be the obligation of your client." (Defendant's Ex. F.)
During December 2000, the defendant contacted the New London Building Official to complain about possible code violations resulting from lack of heat at the restaurant. In response to that complaint, Building Inspector Jack Cipriano went to the premises.
Although Cipriano did not take temperature readings during that inspection, he concluded that the temperature in the restaurant violated the code provisions which require that the working areas of an enclosed building be at least 65 degrees.
On January 26, 2001, the New London Office of Development and Planning sent a notice of violation to the plaintiff (Defendant's Ex. D). The notice informed the plaintiff that the property at 653-655 Bank Street violated §§ 602.3 and 602.4 of the city building code. The notice ordered the plaintiff to "install sufficient heat to property immediately." During his testimony at trial, Cipriano stated that he found only one strip of electric baseboard in the premises. This was located in the dining area. Cipriano observed that there were no permanent heating sources in the bar or kitchen areas. He did not have the equipment necessary to record the temperature at the premises, but believed that it violated the code. The building inspector directed the defendant and her attorney to obtain a heat-loss survey of the premises.
Cipriano testified that he sent the notice of violation to the plaintiff because it is his agency's policy to always send such notices to the building owner.
After inspecting the premises in December, Cipriano visited the plaintiff to inform him of his findings. The plaintiff told the building inspector that he would look into the matter and rectify the situation. The court infers from this evidence that the building inspector's visit CT Page 11370 prompted the landlord to send Mr. Douton to the restaurant.
As noted above, when the negotiations about the heating system between the plaintiff and defendant's counsel broke down, the plaintiff withdrew his offer and demanded that the defendant pay the rent due on December 15, 2000. When the rent was not paid, the plaintiff served defendant with a notice to quit on December 25, 2000. The defendant testified at trial that she paid the amount owed for the December rent, and similar subsequent monthly payment amounts to her lawyer, who has been holding those monies in escrow.
The defendant claimed that the temperature in the restaurant during the winter was approximately 30 degrees. She indicated that her staff wore jackets, and that she had to use space heaters, which violated city building and safety codes. The defendant testified that four customers left the restaurant because of the frigid conditions. She admitted that she did not vacate the premises, or shut down operations at any time. The defendant has continuously operated the restaurant since it opened.
The plaintiff appealed the notice of violation which he received from the building official. On March 5, 2001, the New London Code Enforcement Committee Appeal Panel conducted a hearing on the matter. The panel's decision indicated: "No evidence was submitted and no testimony was given that indicated that this (nonresidential) occupied space was in violation of the sections cited in the Building Official's Abatement Notice." (Defendant's Ex. E.) The Appeal Panel voted unanimously to sustain the landlord's appeal. It withdrew the violation notice issued by Cipriano.
At trial, the plaintiff contended that the subject premises had been used for a restaurant since the 1980's, and that the prior tenants had not complained about a lack of heat. However, the testimony of both a prior tenant, and a heating contractor who previously worked on the property, established that the previous tenants had the benefit of heating sources such as a hot water boiler and heat pumps which were not in place when the defendant signed her lease.
 Discussion
The plaintiff has alleged two grounds for eviction: nonpayment of rent and improper use of the lease premises. The court will address the latter allegation first. The following additional facts are relevant to that count. After taking occupancy, the defendant submitted a request to the New London Zoning Official for permission to have live entertainment at her establishment, which she calls a "supper club". Subsequently, musicians and comedians have performed there on weekends and at other times. The restaurant has a dining area, which serves food, and a bar, or CT Page 11371 lounge, which sells alcoholic beverages. The defendant testified credibly at trial that when there are performances she serves food at the restaurant until late in the evening.
The second paragraph of the lease states: "The Tenant covenants and agrees to use the demise premises as a restaurant and catering business." There is no provision of the lease that prohibits live entertainment on the premises. The plaintiff contends that by sponsoring these performances, the defendant has transformed the business into a night club". The court is not persuaded by that argument. The preponderance of the evidence at trial established that the defendant's primary business is the sale of food and beverage, and that the entertainment offered is ancillary to that purpose. The court finds that the defendant is in compliance with the provisions of paragraph 2 of the lease. Accordingly, the court finds that the plaintiff has failed to prove by a preponderance of the evidence that the defendant engaged in impermissible use of the leased premises.
The plaintiff's remaining allegation is the defendant's failure to pay the December 15, 2000 rent.
The defendant admitted her failure to pay rent. However, she claimed that she was excused from the obligation to do so because the plaintiff breached the lease by failing to provide sufficient heat. The defendant also claimed that the plaintiff knew that the heating system at the premises was insufficient for her purposes and withheld this fact from her.
The plaintiff counters that any upgrade to the existing heating was the responsibility of the defendant, since she assumed the premises "as is."
When she signed the lease, the defendant acknowledged that she had examined the premises and was accepting them in their present condition. [Lease, Paragraph 5.] Prior to signing the lease, the defendant, her contractor and a representative of the CEDF inspected 653-655 Bank Street. After taking occupancy, the defendant worked in the premises during February and March 2000. During this period, the defendant used space heaters and commercial blowers to warm the building while the renovation was being done.
The defendant relies on paragraph 9 of the lease in asserting that it is the plaintiff's obligation to provide additional heating for the building. It reads: "Utilities and services furnished to the demised premises for the benefit of the tenant shall be provided and paid for as follows: water by the tenant, gas by the tenant, electricity by the tenant, heat by the tenant, refrigeration by the tenant, hot water by the CT Page 11372 tenant."
The defendant contends that since utilities and services are to be furnished to the premises for her benefit, it is the plaintiff's contractual obligation to provide sufficient mechanical apparatus to appropriately heat the building. However, the court finds that the contractual language and the facts of this case do not support that argument.
The premises leased by the defendant contained an electric baseboard heating source in the dining area. The defendant acknowledged in the original lease that she had inspected the premises and accepted them in their present condition. The defendant reaffirmed those provisions when she signed the first lease amendment on November 9, 2000.[1] At the time the amendment was signed, the defendant had been in possession of the premises for more than seven months. As indicated above, the defendant worked in the building during February and March, 2000 when the weather was colder.
The court finds that because the defendant agreed to accept the premises "as is," it was her burden to pay for upgrades to the existing heating system.
Additionally, it was not proven that the plaintiff concealed a latent defect from the defendant. The defendant was afforded the opportunity to inspect the property before the lease closing. She did so with others, including her contractor. The defendant had the opportunity at that time to make inquiry about the heating system. The sufficiency of the building's heating system could reasonably have been determined by the defendant or her expert during the inspection.
As noted above, the defendant has raised eight special defenses in this summary process action. "Equitable defenses and counterclaims implicating the right to possession are available in a summary process proceeding."Cumberland Farms, Inc. v. Dairy Mart, Inc., 225 Conn. 771, 777 (1993); citing Fellows v. Martin, 217 Conn. 57, 62-63 (1991).
The first special defense invokes the doctrine of equitable relief against forfeiture. In special defenses two through eight, the defendant raises various equitable arguments predicated upon her claim that the landlord's failure to provide sufficient heat rendered the subject premises untenantable. The court deals first with special defenses two through eight.
In the second special defense, the defendant cites the language of C.G.S. § 47a-4a, which excuses a tenant from paying rent in CT Page 11373 situations where there are housing or health code violations, or where essential services are not provided by the landlord.
The court finds that the statute cited is not applicable in the present case. The provisions of C.G.S. § 47a-1 through 47a-22 apply only to residential dwellings and do not apply to controversies involving commercial leases. Johnson v. Fuller, 190 Conn. 552, 558 (1983);S.H.V.C., Inc. v. Roy, 37 Conn. Sup. 579 (1981
Although the defendant contends that the language of C.G.S. § 47a-1
(g) extends the relief provided by those statutes to the commercial realm, the court does not concur with that interpretation. Based upon its review of the statutes and cases cited above, the court finds that C.G.S. § 47a-4a does not apply to commercial lease cases. For that reason, the defendant's second special defense fails.
In the third special defense, the defendant maintains that the landlord's failure to provide sufficient heat violated her right to quiet enjoyment of the premises. "Whether there has been such interference with the tenant's peaceful enjoyment of the premises cannot be determined by general principle, but depends instead on an inquiry in every instance [into] the facts of the particular case. By this is meant the situation of the parties to a lease, the character of the premises, the use to which the tenant intends to put them and the nature and extent by which the tenant's use of the premises is interfered with by the injury claimed." [Internal quotation marks and internal citations omitted.]Conference Center LTD v. TRC, 189 Conn. 212, 221 (1983). There is a. . . . requirement that the tenant demonstrate actual and serious deprivation of the use contemplated by the parties to the lease . . ."Conference Center LTD v. TRC, supra, 221.
Under Connecticut common law, a substantial interference with the tenant's beneficial enjoyment of the premises resulting from a failure to furnish essential services is sufficient to constitute a constructive eviction if the tenant actually vacates the premises for that reason.S.H.V.C., Inc. v. Roy, supra, 585.
"A constructive eviction arises where a landlord, while not actually depriving the tenant of possession of any part of the premises leased, has done or suffered some act by which the premises are rendered untenantable, and thereby has caused a failure of consideration for the tenant's promise to pay rent. . . . In addition to proving the premises are untenantable, a party pleading constructive eviction must prove that (1) the problem was caused by the landlord; (2) the tenant vacated the premises because of the problem and (3) the tenant did not vacate until after giving the landlord reasonable time to correct the problem." CT Page 11374 (Internal citations and internal quotation marks omitted.) HeritageSquare, LLC v. Eoanou, 61 Conn. App. 329, 332 (2001).
Because the court did not find that the landlord was obligated to upgrade the heating system, the court cannot find that the plaintiff caused the defendant's problem. Also, the defendant never vacated the premises, and has continually operated the restaurant since March 2000. There was not a constructive eviction. Hence, the court cannot find that the business was disrupted or impaired to the point where the defendant was unable to use the premises for the purposes for which they were rented.
In her fourth special defense, the defendant alleged failure of consideration, and in her fifth special defense, the defendant claimed that she was entitled to suspend performance of her obligation to pay rent because of the untenantable conditions. The court's analysis here is similar to its analysis of the third special defense. Claims that the conditions of a leased premises are so poor that they constitute a failure of consideration or excuse the obligation to pay rent are also governed by the doctrine of constructive eviction. Amsterdam Realty Co.v. Frank H. Johnson, 115 Conn. 243 (1932); Conference Center LTD v. TRC,
supra; S.V.H.C. v. Roy, supra.
"Any disturbance of the tenant's possession by the landlord whereby the premises are rendered unfit or unsuitable for occupancy, in whole or in part, for the purposes for which they were leased, amounts to a constructive eviction, if the tenant so elects and surrenders his possession; the rent is suspended by an eviction because it is plainly unjust that the landlord should be permitted to collect it while by his own act he deprives the tenant of the possession which is the consideration for it." (Internal citations and internal quotation marks are omitted.) Amsterdam Realty Co. v. Frank H. Johnson, supra, 248.
Because the court has found that the plaintiff had no contractual obligation to install additional heating, and because the defendant never vacated the premises, the court finds that the defendant has failed to prove the special defenses of failure of consideration and justification for suspension of rent.
The defendant's sixth special defense alleges frustration of purpose. This legal principal ". . . excuses a promisor in certain situations where the objectives of the contract have been utterly defeated by circumstances arising after the formation of the contract." Hess v.Dumochel, 154 Conn. 343, 350-51 (1966). The defendant did not vacate the premises, and the restaurant remained open. The court does not find that a circumstance occurred after the lease signing which defeated the purpose CT Page 11375 of the parties' contract. For those reasons, the defendant's sixth special defense also fails.
In the seventh special defense, the defendant raises the legal argument of commercial impracticability. In essence, the defendant alleges that the lack of heat at the premises rendered the defendant's obligation to pay rent on December 15, 2000 commercially impracticable. This equitable doctrine recognizes that certain conditions of a contract cannot be met because of unforeseen occurrences. (Internal citations omitted.) O'Harav. State, 218 Conn. 628, 637 (1991). A party claiming that a supervening event or contingency has prevented and thus excused a promised performance must demonstrate that: ". . . (1) the event made the performance impracticable; (2) the nonoccurrence of the event was a basic assumption on which the contract was made; (3) the impracticability resulted without the fault of the party seeking to be excused; and (4) the party has not assumed a greater obligation than the law imposes."O'Hara v. State, supra, 637. For the reasons already stated, this court finds that the plaintiff was not under an obligation to provide additional heating apparatus, and that the lack thereof was not an intervening event which made the payment of rent by the defendant impracticable. Here, too, the court notes that the restaurant remained in continuous operation, even during the winter months. Accordingly, the court finds that the defendant has not proven the seventh special defense by a preponderance of the evidence.
In his post-trial memorandum, counsel for the defendant indicated that the eighth special defense for the illegal collection of rent "is abandoned." Accordingly, the court finds that special defense was not proven by a preponderance of the evidence.
The final special defense which the court considers is the first special defense of equitable relief against forfeiture. It is based on the legal principal that "equity abhors a forfeiture." "Equitable principals barring forfeitures may apply to summary process actions for nonpayment of rent if (1) the tenant's breach is not wilful or grossly negligent; (2) upon eviction the tenant will suffer a loss wholly disproportionate to the injury of the landlord; and (3) the landlord's injury is reparable." Fellows v. Martin, supra.
Connecticut's appellate courts were previously unwilling to apply the doctrine of equitable non-forfeiture in situations involving the nonpayment of rent.
In 1991, our Supreme Court deviated somewhat from that position in a case where the tenant withheld a small portion of her rent after a dispute with her landlord over a parking space. Fellows v. Martin,
CT Page 11376 supra. In a decision authored by Justice Shea, the court noted that the ". . . doctrine against forfeiture applies to a failure to pay rent in full when that failure is accompanied by a good faith intent to comply with the lease, or a good faith dispute over the meaning of a lease."Fellows v. Martin, supra, 69.
In a subsequent decision, Cumberland Farms, Inc. v. Dairy Mart,225 Conn. 771, 778 (1993), the Supreme Court reaffirmed its holding inFellows v. Martin and reiterated the three criteria which a defendant seeking equitable relief under that doctrine must satisfy.
The facts in Fellows are somewhat different from those in the case at bar, inasmuch as the defendant in the earlier case only withheld a small portion of her rent. Here, the defendant withheld the full amount of the December rent as a result of her disagreement with the landlord over the heating situation.[2] However, this court is mindful of the our Supreme Court's holding in Fellows that the doctrine against forfeiture might be applied in situations where a good faith dispute over the meaning of the lease is alleged. Accordingly, the court has carefully considered the facts of this case in light of the three criteria set forth in theFellows and Cumberland Farms decisions.
The defendant utilized the $50,000 that she borrowed from the CEDF to renovate the Bank Street premises, and for other start-up costs of the restaurant. She also invested $4,000 in personal funds and money supplied to her by family and friends for those purposes. The defendant is obligated to pay off the remaining balance on the CEDF loan. Pictorial evidence and the credible testimony of the defendant established that the defendant made interior improvements to the premises and expended considerable personal labor to renovate the property.
The plaintiff did not receive the $1,100 rent due on December 15, 2000 and is owed additional use and occupancy for the months of January through August. He took the premises off the rental market for several months in order to give the defendant time to complete her arrangements with the CEDF. The plaintiff has also been paying taxes and insurance on the building without the benefit of his monthly rental payments.
Having weighed each party's potential loss, the court finds that the loss which would be suffered by the defendant is substantially disproportionate to the plaintiff's damages. The court also finds that the plaintiff's loss is reparable.
The third factor which the Court must consider is whether or not the defendant's failure to pay rent was willful, or grossly negligent. CT Page 11377
The parties signed an amended lease on November 9, 2000. In that document, the defendant agreed not to withhold full or partial rent in the event of a breach by the landlord. Both parties were represented by counsel when they executed the amended lease. The amended lease was prepared as part of a stipulation which ended the earlier eviction action instituted by the plaintiff.
For a number of weeks prior to the service of the notice to quit in the present case, the landlord and counsel for the defendant engaged in ongoing negotiations about the heating system. When those negotiations fell apart, the plaintiff wrote to the defendant's counsel on December 12, 2000 (Defendant's Exhibit F). In that correspondence, the plaintiff withdrew his offer to pay for the upgrade of the heating system, and notified the defendant that she must comply with the terms of the lease. The defendant thereafter failed to pay the rent which was due on December 15, 2000.
Based on the foregoing evidence, the court concludes that the defendant made a deliberate and willful decision to withhold the rent. As noted above, the defendant was represented by counsel at the signing of the original lease, and for a number of months prior to December 15, 2000. The court finds that the defendant's actions were not the result of a mistake of law.
Although the defendant claims that the nonpayment resulted from a "good faith disagreement" about the terms of the lease, the court is not persuaded. The defendant agreed in the original lease to assume the premises in their present condition. She inspected the building prior to taking occupancy. The defendant was the subject of an earlier eviction proceeding for non-payment of rent. That case ended with a stipulation that was codified in the November 2000 lease amendment. The defendant agreed in that contract not to withhold rent or deduct setoffs from her monthly rental payments. Based on all of the foregoing facts, the court finds that the defendant's willful conduct in withholding the rent payment due on December 15, 2000 bars her receipt of the equitable relief requested in the Seventh Special Defense.
The court finds, therefore, the defendant has failed to prove the claims set forth in that special defense by a preponderance of the evidence.
Since the court has found by a preponderance of the evidence that the defendant failed to pay the rent due on December 15, 2000, and that she has failed to prove any of her defenses or special defenses, judgment of possession may enter in favor of the plaintiff. CT Page 11378
SO ORDERED.
Dyer, J.