CUMBERLAND FARMS, INC. *v.* DAIRY MART, INC., ET AL.
(14638)

PETERS, C. J., CALLAHAN, BERDON, KATZ and PALMER, Js.

Argued March 31--decision released June 15, 1993

*Paul D. Sanson,* with whom was *John J. Moroney,* for the appellant (plaintiff).

*Wesley W. Horton,* with whom were *George A. Levine* and *Alexandra Davis,* for the appellee (named defendant).

PALMER, J. The plaintiff landlord, Cumberland Farms, Inc., appeals from a judgment for the defendant tenant, Dairy Mart, Inc.,[1] in a summary process action seeking possession of certain leased premises for nonpayment of rent, gasoline gallonage rent and real property taxes.[2] The plaintiff claims that the trial court improperly concluded that the doctrine of equitable nonforfeiture applies to this summary process action and therefore improperly refused to grant possession of the premises to the plaintiff.[3] We disagree.

The record discloses the following imbroglio. On August 1, 1975, Sherman Rocklen and Rocklen, Inc., leased property at 528 Main Street, West Haven (premises) to Chevron Oil Company, now known as Chevron USA Inc. (Chevron), for a term of twenty-two years. The lease grants the tenant the options to renew the agreement, to construct buildings and make other improvements on the premises and to purchase the

---

[1] The defendant Jeffrey R. Kopp is a subtenant of Dairy Mart, Inc. The defendant Chevron USA Inc., the predecessor to Cumberland Farms, Inc., on the lease at issue was known as Chevron Oil Company at all times relevant to this appeal. Unless otherwise indicated, references to the defendant in this opinion are to Dairy Mart, Inc.

[2] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

[3] During the pendency of this case, the plaintiff filed for Chapter 11 relief in the bankruptcy court. The appeal in this court had been stayed pursuant to the automatic stay provisions of the federal bankruptcy code. See 11 U.S.C. § 362 (a). Upon motion by the defendant, the bankruptcy court lifted the automatic stay to permit this appeal and any subsequent trial court proceedings resulting therefrom. *In re Cumberland Farms, Inc., Debtor,* U.S. Bankruptcy Court for the District of Massachusetts, Western Division, Docket No. 92-41305-JFQ (January 21, 1993).

premises for $350,000 after the expiration of the original term of the lease. On July 1, 1979, Chevron entered into a written agreement with the defendant to sublease the premises to it from July 1, 1979, to July 31, 1991, and assigned to the defendant the right to exercise the options.

On June 1, 1986, the plaintiff purchased certain assets from Chevron, including Chevron's interest in the premises.[4] As a result, the defendant became obligated to make payments under the sublease to the plaintiff. The sublease requires that the defendant pay: (1) base rent of $2083.33 per month; (2) additional rent of $.01 per gallon for each gallon of gasoline delivered to the premises in excess of 1,200,000 gallons for each year ending June 30; and (3) real property taxes levied or assessed against the premises.

After the plaintiff had acquired Chevron's interest in the premises, the plaintiff never formally notified the defendant of the assignment of the sublease, the name and address of the new landlord, or the name and address to which rent payments should be sent. As a result, the defendant continued to send rent payments to Chevron.[5] Because the plaintiff was not prepared immediately to assume the financial accounting responsibilities for all its newly acquired assets, including the premises here, Chevron continued to accept the defendant's rent payments and forwarded them to the plain-

---

[4] In 1986, the plaintiff purchased Chevron's "marketing assets" including approximately 600 gasoline stations in ten northeastern states.

[5] Section 27 of the sublease agreement between Chevron and the defendant provides in relevant part: "Until further notice from CHEVRON, all payments to be made and all notices to be given to CHEVRON hereunder shall be made or given to CHEVRON at 1200 State Street, Perth Amboy, New Jersey 08861. . . . Notices to DAIRY MART hereunder shall until further notice by or on behalf of DAIRY MART, be addressed to DAIRY MART at 240 South Road, Enfield, Connecticut 06082. All notices shall be delivered personally or deposited in the United States mail [properly] addressed as aforesaid, with postage fully paid for delivery by certified mail."

tiff from June 1, 1986, until April 1, 1988. In April, 1988, Chevron ceased providing accounting services to the plaintiff and began returning the rent payments to the defendant. Employees of the defendant thereupon initiated contact with the plaintiff in order to verify that payments under the lease were owed to the plaintiff and to determine to whom the payments should be sent in the future. The trial court found that the defendant had demonstrated reasonable diligence in its attempts to determine the reason for the return of its rental payments by Chevron and the name and address to which the rental payments should be sent.[6]

In February, 1989, after repeated telephone inquiries from the defendant, the plaintiff responded, but with a written demand for base rent that misstated certain terms of the assignment. On April 13, 1989, the defendant sent the plaintiff copies of canceled rent checks for the period through April, 1988, accompanied by a cover letter noting that subsequent rent checks had been returned by Chevron and summarizing the defendant's efforts to determine to whom to send the rent payments. The defendant's letter concluded with a request for a recalculation of the amount of rent due and a promise to forward a check upon receipt of that recalculation. It is undisputed that, despite telephone inquiries from the defendant, the plaintiff did not provide the recalculation until November 6, 1989, when the plaintiff contemporaneously gave the defendant written notice of default under the sublease.

---

[6] The trial court heard testimony concerning the difficulties that the defendant had encountered in making rent payments. For example, the plaintiff's own internal error caused it to terminate all billing to the defendant and consequently the plaintiff was unable to determine whether rent was due. In another instance, the defendant canceled a contract with the plaintiff for the supply of gasoline to the premises. The plaintiff accordingly ceased billing the defendant for gasoline but also erroneously canceled all billing, including invoices for rent, to the defendant.

In its letter of November 6, 1989, the plaintiff accepted the defendant's claim that the defendant had paid rent through April, 1988, but requested another set of copies of the canceled rent checks. The plaintiff's letter stated that the rent due totaled $39,583.27 and requested, for the first time, gallonage statements for the years ending June 30, 1987, June 30, 1988, and June 30, 1989, as well as gallonage rent, if due, and reimbursement of $23,677.90 for real estate taxes paid by the plaintiff.[7] The letter stated that it served as notice to cure these defaults, but stated no time period within which the defendant must cure. Although the letter indicated that copies of the property tax bills and canceled tax payment checks were enclosed, these materials inadvertently were not enclosed with the letter. On November 14, 1989, the defendant received the enclosures that had been omitted. On the same day, an employee of the defendant requested that the accounting department draw a check for rent and taxes and prepare a gallonage statement. On December 1, 1989, the defendant sent the gallonage statement to the plaintiff but did not enclose the gallonage rent payment because it anticipated that the plaintiff would want to verify the amount due.[8] The trial court found that a delay in the preparation of the check for base rent and taxes had been caused, in part, by the defendant's negligence because the check had been misplaced on an employee's desk.

On December 15, 1989, the defendant telephoned the plaintiff to apologize for the delay in sending the check for rent and taxes and to indicate that the check was ready to be mailed. An employee of the plaintiff

---

[7] Prior to June, 1986, the town of West Haven sent real property tax bills to Rocklen in care of Chevron. Chevron thereupon paid the taxes and billed the defendant. After June, 1986, the plaintiff paid the property taxes but did not seek reimbursement from the defendant until November 6, 1989.

[8] The defendant calculated that it owed gallonage rent of $1573.58.

responded that the matter had been turned over to legal counsel. The defendant's employee nonetheless prepared a transmittal letter and mailed it with a check in the amount of $63,065.55 payable to the plaintiff. At approximately 6:15 p.m. on December 15, the defendant received a hand delivered letter from the plaintiff's general counsel advising the defendant that the sublease would be terminated on December 26, 1989, for nonpayment of rent. On December 20, 1989, counsel for the plaintiff prepared and signed a notice to quit.[9] On December 21, 1989, the defendant issued a check in the amount of $2083.33 to the plaintiff for the December base rent. In February, 1990, the defendant paid to the plaintiff $1377.96 for the gallonage rent due for the year ending June 30, 1989.[10] The plaintiff returned both checks to the defendant with the explanation that they could not be accepted because the lease had been terminated.

The dispute between the parties that prompted this action concerns the late tender of the past due rent, real estate taxes and the December, 1989 base rent.[11] The plaintiff alleged that the defendant had failed to pay: (1) base rent, totaling $41,666.60, for the period from May 1, 1988, to December 1, 1989; (2) gallonage rent, totaling $1377.96, for the year ending June 30, 1989[12]; and (3) real property taxes in the amount of $23,677.90.

---

[9] No evidence was offered as to when the notice to quit was served and therefore the trial court made no finding with respect to the date of its service.

[10] No gallonage rent was due for the years ending June 30, 1987, or June 30, 1988.

[11] Since December, 1989, the defendant has paid to the plaintiff base rent, gallonage rent and real property taxes as required by the sublease.

[12] The sublease requires that a statement of the number of gallons delivered accompany each gallonage rent payment and the plaintiff alleged that the defendant had failed to provide such statements for the years ending June 30, 1987, June 30, 1988, and June 30, 1989.

The trial court, in its ruling denying the plaintiff's claim for summary process, found that the plaintiff had never given formal notice to the defendant of the assignment of the sublease or the change in landlords under the sublease. Although the trial court noted that the defendant had been negligent in not paying the past due rents, it found that the defendant's failure to pay the arrearage was not willful. The court observed: "This is not a case where a tenant knowingly neglected to pay its rent for nineteen consecutive months. It is a case where, as a result of a major corporate acquisition involving 600 gasoline stations in ten states, including the sublease for the premises, there was confusion about the identity of the landlord and where to send rental payments. The tenant diligently sought to obtain the necessary information from a confused landlord, who could not calculate the amount owed for seven months after the tenant had requested it. Throughout the entire period of nonpayment the tenant consistently affirmed its intention and willingness to pay the rent and did tender the arrearage within approximately thirty days after calculations were finally provided." The trial court concluded that the equitable defense against forfeiture applied to the facts of this case and denied the plaintiff's motion for possession.[13]

"[E]quitable defenses and counterclaims implicating the right to possession are available in a summary process proceeding. If, then, the tenant's equitable claim was properly raised, it was properly before the trial court." *Fellows* v. *Martin*, 217 Conn. 57, 62–63, 584 A.2d 458 (1991). The defendant properly raised the issue in the trial court and we proceed to consider it upon review. Id., 64.

[13] The defendant filed several special defenses: lack of notice, equitable nonforfeiture, equitable estoppel, laches, and waiver of alleged default and renewal of sublease. The trial court concluded that the doctrine of equitable nonforfeiture was dispositive and did not, therefore, address the merits of the defendant's other special defenses.

Equitable principles barring forfeitures may apply to summary process actions for nonpayment of rent if: (1) the tenant's breach was not willful or grossly negligent; (2) upon eviction the tenant will suffer a loss wholly disproportionate to the injury to the landlord; and (3) the landlord's injury is reparable. Id., 66–67. With these principles as our guide, we traverse the thicket presented by the circumstances of this case.

The plaintiff first claims that the trial court should not have relieved the defendant from forfeiture because the court should have held the defendant's conduct to have been willful or at least grossly negligent. Willful or gross negligence in failing to fulfill a condition precedent of a lease bars the application of the doctrine of equitable nonforfeiture. *Fellows* v. *Martin,* supra, 67; *Nicoli* v. *Frouge Corporation,* 171 Conn. 245, 247, 368 A.2d 74 (1976); *Elliott* v. *South Isle Food Corporation,* 6 Conn. App. 373, 377, 506 A.2d 147 (1986). In circumstances involving the nonpayment of rent, we have construed strictly this threshold requirement in deciding whether to grant equitable relief. *Brauer* v. *Freccia,* 159 Conn. 289, 293–94, 268 A.2d 645 (1970); see also *Mobilia, Inc.* v. *Santos,* 4 Conn. App. 128, 492 A.2d 544 (1985). We have also stated more recently, however, that "[t]he doctrine against forfeitures applies to a failure to pay rent in full when that failure is accompanied by a good faith intent to comply with the lease or a good faith dispute over the meaning of a lease." *Fellows* v. *Martin,* supra, 69; see also *Petterson* v. *Weinstock,* 106 Conn. 436, 138 A. 433 (1927).

In the present case, the trial court examined the conduct of both parties throughout the entire course of their relationship, noted numerous examples of how the defendant had initiated and pursued communications with the plaintiff and found that the defendant had tendered rents and taxes due within approximately thirty days of receiving the plaintiff's recalculations of those

amounts. The trial court concluded that the evidence did not demonstrate willful conduct or gross negligence on the part of the defendant but rather indicated that the defendant had acted diligently in its attempts to obtain the information necessary to eliminate the arrearage.[14] These findings are amply supported by the record.

"[I]n case of mere neglect in fulfilling a condition precedent of a lease . . . equity will relieve when the delay has been slight, the loss to the lessor small, and when not to grant relief would result in such hardship to the tenant as to make it unconscionable to enforce literally the condition precedent of the lease." *F.B. Fountain Co.* v. *Stein,* 97 Conn. 619, 626–27, 118 A. 47 (1922); see also *Brauer* v. *Freccia,* supra, 295–96; *R & R of Connecticut, Inc.* v. *Stiegler,* 4 Conn. App. 240, 243, 493 A.2d 293 (1985). The plaintiff's conduct contributed significantly to the delayed payment of rents and taxes. The trial court properly concluded, in the circumstances of this case, that the delay solely attributable to the defendant's conduct, although negligent, was slight and was not sufficient to entitle the plaintiff to possession.

We next consider the impact of forfeiture on the parties. The trial court evaluated the loss to each party in the event of forfeiture and concluded that the impact on the defendant would be wholly disproportionate to the injury suffered by the plaintiff. See *Fellows* v. *Martin,* supra, 66. The trial court determined that the defendant's interest, in the event of forfeiture, included the value of the option to purchase the premises and

---

[14] The trial court stated: "Although Dairy Mart was negligent in not paying the rent, Dairy Mart personnel acted diligently to attempt to obtain the information needed to correct the nonpayment situation when Chevron started returning the rent checks. Dairy Mart's diligence was not met, however, with like diligence on the part of Cumberland, which consumed months simply to determine the amount of rent which was owed."

the value of capital improvements it had made to the premises. The sublease granted to the defendant the option to purchase the premises for $350,000.[15] Moreover, the defendant had made a "substantial investment in the leasehold"; id., 72 (*Peters, C. J.,* concurring); by having improved the premises at a total cost of approximately $420,000. On the other hand, the arrearages totaling $63,065.55 comprised the plaintiff's potential injury.

The plaintiff argues, however, that the trial court improperly failed to consider, in its valuation of the parties' interests, two further factors affecting the equities between the parties. The plaintiff maintained that it would be harmed if it could not exercise the option to purchase the premises. Furthermore, the plaintiff had offered to compensate the defendant for the book value of its capital improvements to the premises. We are unpersuaded.

The plaintiff cites neither authority nor evidence to substantiate its claim that it has a right to the option to purchase the premises. The option was granted to the defendant by the plaintiff's predecessor and was not, therefore, equally available to the plaintiff. Only upon the termination of the sublease as originally negotiated between Chevron and the defendant would the defendant forfeit its option to purchase the premises. The plaintiff cannot lose that to which it has no right. The trial court, therefore, properly excluded the value of the option to purchase the premises when it calculated the plaintiff's injury.

The plaintiff also contends that its offer to reimburse the defendant for the book value of the improvements to the premises ought to have been considered by the trial court in evaluating the defendant's loss in the

---

[15] The parties have stipulated that the fair market value of the premises at the time of trial was $800,000.

event of forfeiture. We are not persuaded that the trial court had to consider an offer made during the course of litigation in the absence of its acceptance by the offeree. Even assuming the availability of proper compensation for the capital improvements, the trial court could properly have concluded that the loss of the option to purchase the premises would nonetheless make the loss to the defendant wholly disproportionate to the injury caused to the plaintiff by nonpayment of rents and taxes.

The plaintiff claims finally that the trial court improperly found that its losses were reparable. In support of its claim, the plaintiff reiterates its argument that the trial court improperly refused to include its purported loss of the option to purchase the premises. For the reasons stated above, we conclude that the trial court properly excluded the value of the option to purchase the premises in calculating the loss to the plaintiff.

The plaintiff argues alternatively that the defendant did not tender interest on the arrearage and that the trial court improperly failed to order it to do so. It is undisputed that the defendant owed the plaintiff unpaid rents and taxes and that the trial court made no finding concerning interest.[16]

The failure to tender an indeterminate amount of discretionary interest is not fatal to the defendant's request for equitable relief from forfeiture. See *Fellows*

[16] The defendant paid $63,065.55 to the plaintiff on October 21, 1992. The recalculation of amounts due provided by the plaintiff did not include interest. The plaintiff conceded, at oral argument, that the issue of interest was not raised until it had submitted its posttrial memorandum. The defendant acknowledges that it did not tender interest and, at oral argument, conceded that a judgment in its favor would properly be conditioned upon further proceedings to determine whether interest is due to the plaintiff in these circumstances. See *Fellows* v. *Martin,* 223 Conn. 152, 154–55, 611 A.2d 412 (1992).

v. *Martin,* supra, 67 n.10; *Thompson* v. *Coe,* 96 Conn. 644, 655, 115 A. 219 (1921); *Danpar Associates* v. *Falkha,* 37 Conn. Sup. 820, 823 n.1, 438 A.2d 1209 (1981). The record does not indicate that the nonpayment of interest was an issue material to the litigation between the parties. Moreover, in light of the sums and the time periods in this case, the amount of interest involved could not be sufficient to alter our conclusion that forfeiture would result in a loss to the defendant wholly disproportionate to the injury caused to the plaintiff by the defendant's nonpayment of interest. The trial court concluded that the doctrine of equitable nonforfeiture shields the tenant from forfeiture on these facts. The record supports that determination. *Fellows* v. *Martin,* supra, 68.

We conclude, therefore, that the defendant is entitled to equitable relief from the forfeiture of the sublease conditioned upon its timely payment of any interest found to be due to the plaintiff. A further hearing is required, however, to establish whether interest is due to the plaintiff and, if so, the amount thereof.

The judgment is affirmed and the case is remanded for further proceedings regarding interest in accordance with this opinion.

In this opinion the other justices concurred.