19 PERRY STREET, LLC *v.* THE UNIONVILLE
WATER COMPANY ET AL.
(SC 18344)

Rogers, C. J., and Norcott, Katz, Palmer, Vertefeuille, Zarella and McLachlan, Js.

612

Argued October 20, 2009—officially released February 2, 2010

*Michael J. Donnelly,* with whom was *Genea O. Bell,* for the appellants (defendants).

*Eric M. Grant*, with whom, on the brief, was *George G. Mowad II*, for the appellee (plaintiff).

*Opinion*

NORCOTT, J. The defendant, The Connecticut Water Company,[1] appeals[2] from the judgment of the trial court, which found that the defendant had breached its lease agreement (lease) with the plaintiff, 19 Perry Street, LLC, and ordered immediate possession of the leased premises in favor of the plaintiff. On appeal, the defendant claims that the trial court improperly: (1) interpreted paragraph five of the lease, as amended in 1990, as providing for cash payments as the only form of rent; (2) found that the defendant had breached the lease because it had failed to tender rent to any person in any form once payments became due under paragraph six of the lease; and (3) determined that the defendant was not entitled to retain possession under the doctrine of equitable nonforfeiture. We agree with the defendant's third claim and conclude that the trial court improperly determined that the defendant was not entitled to retain possession of the premises under the doctrine of equitable nonforfeiture. Accordingly, we reverse the judgment of the trial court and remand the case for further proceedings.

The record reveals the following relevant facts found by the trial court, and procedural history. The named defendant, The Unionville Water Company (Unionville Water), and the defendant, are specially chartered Con-

[1] In 2002, The Connecticut Water Company acquired the named defendant, The Unionville Water Company (Unionville Water), assuming its rights and obligations under the lease agreement at issue. The Connecticut Water Company operated Unionville Water as a subsidiary until 2006, when Unionville Water merged into The Connecticut Water Company. All references herein to the defendant are to The Connecticut Water Company.

[2] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

necticut corporations created by special acts of the General Assembly. Their purpose is to create exclusive service areas in which to conduct certain activities, including the taking and distribution of water for the public water supply. On February 20, 1975, Unionville Water entered into a ninety-nine year lease with Chas. W. House & Sons, Inc. (House), of a well field located at 19 Perry Street in the village of Unionville in the town of Farmington. Pursuant to the lease, Unionville Water installed five wells and extracted groundwater from the aquifer under House's property for treatment and public distribution.

House previously had maintained a manufacturing facility at the site, and it had used water purchased from Unionville Water to carry out its operations. In accordance with this scheme, House and Unionville Water agreed that Unionville Water's rent payment would be directly proportional to House's water cost. The original version of paragraph five of the lease set the rent at 33 percent of House's average annual water cost, payable monthly.[3] Paragraph six of the lease set out a formula for calculating rent that was to be used "[i]n the event that House shall change its operations so as to substantially reduce its average annual water consumption . . . ."[4] Paragraph six was never

---

[3] Paragraph five of the 1975 lease provided in relevant part: "[O]n the first day of each month thereafter, the [defendant] shall pay to House as rent a monthly amount equal to thirty-three (33%) percent of House's average annual water cost. Average annual water cost shall be computed monthly by applying the then prevailing rates of the [defendant] applicable to House . . . to House's average annual water consumption for the five years next preceding the date of commencement of rent, or in succeeding years, the average of the five years next preceding the most recent anniversary of that date of commencement. Notwithstanding the foregoing, the minimum monthly rent payable in any month shall be the rent paid for the next preceding month, it being the intention of the parties that the rent payable under this agreement not diminish during its term."

[4] Paragraph six of the 1975 lease provided in relevant part: "In the event that House shall change its operations so as to substantially reduce its average annual water consumption, monthly rental after such change shall be determined as if House's average annual consumption of water were the

amended. Paragraph five was, however, amended twice. On November 30, 1978, House and Unionville Water amended paragraph five to clarify the formula for calculating rent and to require that Unionville Water pay rent "by deducting the amount due quarterly from House's bill each quarter."[5] This resulted in House receiving credit on its water bills in lieu of rental payments in cash and, according to the defendant, House would then tender to Unionville Water the net balance of the bills. On February 12, 1990, House and Unionville Water again amended paragraph five by increasing the rent to 74.1 percent of House's actual water bill, and by deleting the sentence requiring that the rent be paid through deductions from House's water bills.[6] The 1990 amendment also, however, instituted a quarterly payment schedule, but continued timing such payments to coincide with House's established billing cycle.

On January 25, 1995, a mortgage deed was executed by House in favor of Liberty Bank for the premises. The mortgage deed was recorded promptly on the Farmington land records, and identified Unionville Water's

same as the highest average annual consumption used in computing the rent for any month prior to the reduction in consumption. . . ."

[5] Paragraph five, as amended in the 1978 lease, provided in relevant part: "The first sentence in [p]aragraph [five] is amended to read as follows . . . '[O]n the first day of each month thereafter, the [defendant] shall pay to House as rent a monthly amount equal to one-twelfth of thirty-three (33%) per cent of House's average annual water cost.' . . . The following sentence is added to [p]aragraph [five] and made a part thereof: Rent shall be paid by [the defendant] by deducting the amount due quarterly from House's bill each quarter."

[6] Paragraph five, as amended in the 1990 lease, provided in relevant part: "Paragraph [five] of said [l]ease is hereby deleted and the following substituted in its place . . . '[O]n the first day of each third month thereafter, the [defendant] shall pay to House as rent a quarterly amount equal to seventy-four and one-tenth (74.1%) percent of House's actual water cost for the prior three (3) months. The actual water cost shall be computed quarterly by applying the then prevailing rates of [Unionville Water] applicable to House . . . .' "

otherwise unrecorded lease as an encumbrance.[7] The leasehold interest created by the 1975 lease as amended, thus, predated the 1995 mortgage deed.

The plaintiff is a limited liability company that was created for the acquisition of the premises. In the fall of 2003, Dwayne Crisco, a principal of the plaintiff, telephoned David L. Radka, manager of water resources and planning of the defendant, which had acquired Unionville Water in 2002. See footnote 1 of this opinion. Crisco informed Radka that the plaintiff was interested in purchasing the mortgage on the premises from Liberty Bank. Crisco also inquired about the defendant's lease with House, and specifically about House's highest annual water usage. Beginning on March 17, 2004, the plaintiff and the defendant exchanged a series of letters in which they attempted to negotiate a sale of the portion of the premises under the lease if and when the plaintiff became the record owner. In the first of these letters, dated March 17, 2004, the plaintiff, through Joseph P. Yamin, one of its principals, acknowledged the defendant's lease and stated that, if a sale went forward, the plaintiff would be "responsible for delivery of the premises free and clear of all existing tenants, *except [the defendant's] present tenancy.*" (Emphasis added.) On March 29, 2004, Radka replied with a letter containing the terms and conditions under which a purchase would be feasible for the defendant. Yamin responded on April 13, 2004, with a letter again acknowledging the defendant's lease with House and offering to sell the portion of the premises covered by the lease, but without changing the terms of its initial offer. The negotiations failed and communications ended with the defendant's April 15, 2004 letter, in which Radka stated

---

[7] At the time of the mortgage deed's execution, the lease was not yet recorded. The lease remained unrecorded until August 11, 2005, when Unionville Water recorded an affidavit of facts concerning the lease on the Farmington land records.

that the defendant was unable to agree to the terms of the proposed sale and, further, that it would "continue to operate under its lease agreement."[8] The plaintiff did not respond to this letter, although Frank Ruocco, another principal of the plaintiff, acknowledged receiving it.

On December 23, 2003, Liberty Bank assigned all of its interest in the mortgage deed for the premises to the plaintiff for $600,000. Subsequently, the plaintiff foreclosed on the mortgage. Neither the defendant nor Unionville Water was a party to the foreclosure proceedings. Title became absolute in the plaintiff on March 30, 2005. The plaintiff filed a certificate of foreclosure in the Farmington land records on April 13, 2005.

In the meantime, by early 2004, House had ceased its operations. House made its final water payment in January, 2004. Thereafter, House did not pay water invoices; instead, these invoices were returned to the defendant as undeliverable. Around this time, the defendant also learned that House's telephone service had been disconnected, and the defendant was thus unable to contact House either by telephone or mail, with no indication from House as to its status. Subsequently, the defendant instructed its attorney to make periodic searches of the land records to determine whether, and to whom, the premises had been sold. The defendant's searches did not reveal the plaintiff's certificate of foreclosure, although it had been recorded in April, 2005. No notice was given by the plaintiff to the defendant as to the former's gaining title to the premises until

[8] Radka continued: "Please contact me or Mr. Thomas Mongillo of our Unionville office if and when [the plaintiff] acquires title to the property (my understanding from [Crisco] was that this had yet to occur) so that we may update our records to ensure that the proper lease credits continue to be applied. Also, please feel free to contact me if you wish to discuss lease payments in lieu of such credits, under the terms of the amended agreement."

April, 2007, when the plaintiff served the defendant with a notice to quit. Despite the plaintiff's failure to contact the defendant, the defendant began to set aside funds in late 2004, in the event that the owner—whether House, the plaintiff, or another entity—notified the defendant that rent would be payable in cash.

On April 17, 2007, the plaintiff served the defendant with a notice to quit, instructing it to quit possession or occupancy of the premises on or before May 18, 2007, for, inter alia, "[nonpayment] of rent . . . ."[9] Shortly after receiving the notice to quit, Radka telephoned George Mowad, counsel for the plaintiff, offering to make payments to bring the lease current. Mowad informed Radka that, in the plaintiff's view, the lease was not valid and that the plaintiff would not accept rental payments from the defendant.

From March 30, 2005, when title became absolute in the plaintiff, until the trial in April, 2008, the defendant, having remained in possession of the portion of the premises identified in the lease, had not made any rent or use and occupancy payments to the plaintiff. At the time of the trial, the defendant was pumping approximately 1,500,000 to 2,000,000 gallons of water each day from the wells on the premises. This amounted to approximately one half of the village of Unionville's daily water supply requirement.

After serving the notice to quit, the plaintiff brought this summary process action. After a trial to the court, the trial court rendered judgment of immediate possession of the premises in favor of the plaintiff. In finding for the plaintiff, the court noted that, after paragraph five had been amended in 1990, the conduct of both House and Unionville Water, namely, in continuing the practice of tendering rent via water bill credits, was in

---

[9] The notice to quit was found to be legally sufficient by the trial court, and its sufficiency is not challenged in this appeal.

direct violation of the clear and unambiguous language of paragraph five, which provided for cash payments as the only form of rent. Further, the trial court noted that, when the defendant became aware that House had ceased operations in 2004 and, accordingly, no longer was using the defendant's water resources, paragraph six in the lease was "trigger[ed]" as this occurrence reflected a "substantial reduction in House's annual water consumption [as] contemplated in paragraph six," requiring rental payments in the amount of 74.1 percent of House's " 'highest average annual consumption used in computing the rent for any month prior to the reduction in consumption.' " In response to the defendant's argument that paragraph six was not triggered because previous fluctuations in House's quarterly water charges—for instance, from over $4000 in 2000 to less than $300 in early 2004—were "acceptable to the parties without resort to paragraph six," the trial court stated that the drop in water use to zero when House ceased operations in 2004 was clearly the "substantial reduction" contemplated in paragraph six, as "a more obvious example of a substantial reduction in water consumption is difficult to contemplate." Moreover, the trial court found no obligation imposed, either by statute, in case law or contractually, that the plaintiff, as landlord, had an affirmative duty to notify the defendant that paragraph six had been triggered. Thus, the trial court noted that, because paragraph six was triggered, the defendant was required to tender rent in the form of cash payments to the plaintiff when the latter acquired title to the premises in March, 2005. Because the defendant had failed to tender rent in accordance with paragraph six, the trial court found that the defendant had breached the lease.

The defendant filed numerous special defenses, including invocation of the doctrine of equitable nonforfeiture. With respect to this special defense, the trial

court determined that the defendant had failed to satisfy the relevant test set forth in *Cumberland Farms, Inc. v. Dairy Mart, Inc.*, 225 Conn. 771, 778, 627 A.2d 386 (1993), because its: (1) conduct was wilful and grossly negligent; (2) injury was not wholly disproportionate to that of the plaintiff; and (3) failure to pay rent was not in a good faith effort to comply with the lease, or in a good faith dispute over the meaning of the lease. In so concluding, the trial court distinguished the present case from *Cumberland Farms, Inc.*, by noting that in that case, once the former landlord began returning the tenant's rental payments, the tenant "initiated contact with the party whom it knew to be in the process of becoming the current landlord, if not already, in order to verify that the payments under the lease were owed to the plaintiff and to determine how to address future payments." See *Cumberland Farms, Inc. v. Dairy Mart, Inc.*, supra, 773–74. Conversely, in the present case, the trial court noted that the defendant "did not contact" the plaintiff once the water invoices it had sent to House were returned to it as undeliverable in early 2004 and, furthermore, "[w]hile the [defendant] did search the land records periodically in search of any change in ownership of the premises, [it was] not able to satisfactorily explain why [it] did not become aware of the certificate of foreclosure filed by the plaintiff." Therefore, the trial court concluded that the defendant had failed to sustain its burden of proof on the special defense of equitable nonforfeiture. Accordingly, the trial court rendered judgment of immediate possession of the premises in favor of the plaintiff. This appeal followed. See footnote 2 of this opinion.

On appeal, the defendant claims that the trial court improperly: (1) interpreted paragraph five of the lease, as amended in 1990, as providing only for cash payments; (2) found that the defendant had breached the lease because it had failed to tender rent to any person

in any form once payments became due under paragraph six of the lease; and (3) found that the defendant was not entitled to retain possession under the doctrine of equitable nonforfeiture. We address each claim in turn.

I

The defendant's first claim is that the trial court improperly interpreted paragraph five of the lease, as amended in 1990, as providing for cash payments as the only form of rent. The defendant claims that paragraph five is ambiguous and that it did not preclude payments in the form of water bill credits. Alternatively, the defendant asserts that, even if the amended language of paragraph five prohibited payment by water bill credits, the parties had modified the lease through their course of conduct to permit payment in that manner. The plaintiff responds that the trial court properly applied the express terms of paragraph five, which clearly and unambiguously called for cash payments as the only form of rent. Further, the plaintiff asserts that the trial court correctly determined that any course of conduct between House and the defendant that involved the payment of accepting rent through credits was in violation of the clear terms of paragraph five. We disagree with the defendant.

We begin our analysis with the applicable standard of review. "The defendant's claim presents a question of contract interpretation because a lease is a contract, and, therefore, it is subject to the same rules of construction as other contracts. . . . The standard of review for the interpretation of a contract is well established." (Citation omitted.) *Bristol* v. *Ocean State Job Lot Stores of Connecticut, Inc.*, 284 Conn. 1, 7, 931 A.2d 837 (2007). "Ordinarily the parties' intent is a question of fact. . . . Where a party's intent is expressed clearly and unambiguously in writing, however, the determina-

tion of what the parties intended . . . is a question of law [over which our review is plenary]." (Citation omitted; internal quotation marks omitted.) *Auto Glass Express, Inc.* v. *Hanover Ins. Co.*, 293 Conn. 218, 225, 975 A.2d 1266 (2009).

"The intent of the parties as expressed in [writing] is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the [writing]. . . . Where the language of the [writing] is clear and unambiguous, the [writing] is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a [written instrument] must emanate from the language used in the [writing] rather than from one party's subjective perception of the terms." (Internal quotation marks omitted.) Id., 226.

"If the language of [a] contract is susceptible to more than one reasonable interpretation, [however] the contract is ambiguous." (Internal quotation marks omitted.) *Bristol* v. *Ocean State Job Lot Stores of Connecticut, Inc.*, supra, 284 Conn. 7. Such ambiguity "permits the trial court's consideration of extrinsic evidence as to the conduct of the parties." *Poole* v. *Waterbury*, 266 Conn. 68, 97, 831 A.2d 211 (2003). Moreover, "the trial court's interpretation of a contract, being a determination of the parties' intent, is a question of fact that is subject to reversal on appeal only if it is clearly erroneous." (Internal quotation marks omitted.) Id. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when

although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Ravetto* v. *Triton Thalassic Technologies, Inc.*, 285 Conn. 716, 727, 941 A.2d 309 (2008). Because we conclude that the amended paragraph five is ambiguous regarding the appropriate form of rental payment, we apply the clearly erroneous standard of review to the trial court's determination.

The trial court construed paragraph five narrowly as requiring rental payments in the form of cash only, thereby abolishing the practice of paying rent via water bill credits. The trial court noted that, because the relevant language contained in the 1990 amendment to paragraph five of the lease replaced the previous form of paragraph five, as amended in 1978, which had called for rental payments in the form of deductions from House's bill, paragraph five reasonably could be construed as abolishing the defendant's practice of paying rent via water bill credits and, thus, reverting back to payment by cash only. As previously noted, paragraph five, as amended in 1990, provides in relevant part: "[O]n the first day of each third month . . . the [defendant] shall pay to House as rent a quarterly amount equal to seventy-four and one-tenth (74.1%) percent of House's actual water cost for the prior three (3) months. . . ." (Internal quotation marks omitted.) The language of a lease is ambiguous if it is "susceptible to more than one reasonable interpretation . . . ." (Internal quotation marks omitted.) *Bristol* v. *Ocean State Job Lot Stores of Connecticut, Inc.*, supra, 284 Conn. 7. Our conclusion that the language of the amended paragraph five is ambiguous rests on the following reasoning. Because amended paragraph five does not specifically call for payment by "cash," "cash only," or some variant thereof, it would be reasonable to construe the language in paragraph five more broadly and, accordingly, as

permitting the use of cash *or* credits for payment of rent. Applying the clearly erroneous standard, we cannot conclude that "there was no evidence in the record to support" the trial court's determination, nor are we "left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Ravetto* v. *Triton Thalassic Technologies, Inc.*, supra, 285 Conn. 727.

Noting that for roughly fourteen years from the date of the amendment—from 1990 to 2004—House and the defendant continued to use credits as the chosen form of rental payment, the defendant, alternatively, contends that this court should look to the conduct of the parties in construing the contract to call for credits rather than cash as the appropriate form of rental payment. We disagree, however, and conclude that the language of the lease controls. "In determining the meaning and effect of the controverted language in the lease, the inquiry must focus on the intention expressed in the lease and not on what intention existed in the minds of the parties." (Internal quotation marks omitted.) *Tinaco Plaza, LLC* v. *Freebob's, Inc.*, 74 Conn. App. 760, 767, 814 A.2d 403, cert. granted on other grounds, 263 Conn. 904, 819 A.2d 840 (2003) (motion to dismiss granted February 4, 2004). On the basis of its determination that paragraph five called for rental payments in cash, the trial court, therefore, properly found that the conduct of the defendant and House between 1990 and 2004 was contrary to the lease's prescription. Accordingly, the trial court properly interpreted paragraph five of the lease, as amended in 1990, as providing for cash payments as the only form of rent.

II

The defendant next claims that the trial court improperly found that it had breached the lease because it had failed to tender rent to any person in any form once

payments became due under paragraph six of the lease. The defendant asserts that its tender to House in the form of water bill credits operated as a tender to the plaintiff and, moreover, that its tender was valid because both House and the plaintiff expressed through their conduct an intention not to receive any payment in any form. The plaintiff responds that the trial court correctly concluded that the defendant did not tender rent to either House or the plaintiff, as required by paragraph six. We agree with the plaintiff.

We begin our analysis with the applicable standard of review. Whether the trial court properly found that the defendant breached the lease by failing to tender rent is a question of fact. Factual findings are subject to a clearly erroneous standard of review. *Ravetto* v. *Triton Thalassic Technologies, Inc.*, supra, 285 Conn. 727. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) Id.

In order to prevail in a summary process action alleging nonpayment of rent, a landlord must show that the tenant failed to tender rent prior to the service of the notice to quit. *Mayron's Bake Shops, Inc.* v. *Arrow Stores, Inc.*, 149 Conn. 149, 156, 176 A.2d 574 (1961). "A tender is an offer to pay a debt or discharge a duty, and . . . the offer to pay involves, as a general rule, the actual production of the money and the placing of it in the power of the person entitled to receive it. . . . The formal production of the amount to be tendered is excused, however, by an unequivocal declaration that it will not be received." (Citation omitted.) Id., 155–56.

In the present case, the trial court found that the defendant never had paid any rent to either House or

the plaintiff after House's water use fell to zero. On appeal, the defendant does not claim that it paid rent to House or the plaintiff but, rather, contends that it was excused from the tender of rent because of both House's and the plaintiff's "refusal to receive rent . . . ." The defendant contends that House's failure to leave any contact information once it ceased operations excused the defendant from having to pay rent in any form. Further, the defendant asserts, House's mail was returned, and its telephone disconnected, rendering futile any further effort to pay rent. The defendant claims that this defense of tender is also applicable to the plaintiff, as House's assignee. Additionally, the defendant contends that the plaintiff's own conduct, namely, in "keeping hidden its identity as landlord," was tantamount to a refusal to receive rent. We disagree.

In accordance with the plain language of paragraph six of the lease, once House's water consumption fell to zero, in early 2004, the defendant was required to pay rent in accordance with the formula set out in that provision. As the trial court noted, this event necessarily represented the "substantial reduction" in House's annual water consumption contemplated in paragraph six, because if a water use of zero was not a substantial reduction, then paragraph six was rendered superfluous. See *Honulik* v. *Greenwich*, 293 Conn. 698, 711, 980 A.2d 880 (2009) ("[i]n construing contracts, we give effect to all the language included therein, as the law of contract interpretation . . . militates against interpreting a contract in a way that renders a provision superfluous" [internal quotation marks omitted]). Moreover, we agree with the trial court that the defendant pointed to no authority, either in statutory or case law, or in the lease itself, establishing that either House or the plaintiff, as landlord, had an affirmative duty to notify the defendant that paragraph six had been triggered. The defendant simply failed to comply with the

directive contained in paragraph six, and the defendant's stockpiling of funds did not constitute a tender of rent as required by paragraph six.

The defendant, nevertheless, claims that it was excused from paying rent because of House's refusal to receive rent. The defendant contends that House's failure to leave any contact information once it ceased operations excused the defendant from having to produce rent in any form to House and that, therefore, as House's assignee, the plaintiff is also subject to this defense of tender. We disagree with the defendant. "The formal production of the amount to be tendered is excused . . . by an unequivocal declaration that it will not be received." *Mayron's Bake Shops, Inc.* v. *Arrow Stores, Inc.*, supra, 149 Conn. 156. Regardless of whether House's failure to leave any contact information once it ceased operations was tantamount to "an unequivocal declaration that [rent] will not be received," such alleged failure cannot be imputed to the plaintiff. The plaintiff was not bound by House's conduct predating its acquisition of title. The plaintiff did not, as the defendant claims, acquire the premises from House by way of assignment but, rather, it took title to the property through foreclosure of the mortgage. While an assignee " '[stands] in the shoes of his assignor, with the same rights' " and duties; *Reynolds* v. *Ramos*, 188 Conn. 316, 320 n.5, 449 A.2d 182 (1982), quoting *Leonard* v. *Bailwitz*, 148 Conn. 8, 13, 166 A.2d 451 (1960); as a foreclosing mortgagee, the plaintiff takes control of the mortgaged property through legal process, and thus is not bound by the prior conduct of the mortgagor, House. See *Ocwen Federal Bank, FSB* v. *Charles*, 95 Conn. App. 315, 323, 898 A.2d 197 ("[T]he effect of strict foreclosure is to vest title to the real property absolutely in the mortgagee and to do so without any sale of the property. A judgment of strict foreclosure, when it becomes absolute and all rights of redemption are cut off, constitutes an *appropriation*

of the mortgaged property to satisfy the mortgage debt." [Emphasis added; internal quotation marks omitted.]), cert. denied, 279 Conn. 909, 902 A.2d 1069 (2006).

The defendant also claims that it was excused from tendering rent to the plaintiff because the plaintiff itself "refus[ed] to receive rent" by failing to notify the defendant of its status as landlord of the premises. The plaintiff, however, did not make "an unequivocal declaration" that rent would not be received. *Mayron's Bake Shops, Inc.* v. *Arrow Stores, Inc.*, supra, 149 Conn. 156. Although the plaintiff failed to provide the defendant with actual notice as to its acquisition of title to the premises, it did, in fact, record its certificate of foreclosure in the Farmington land records in April, 2005, thereby providing the defendant with record notice of its identity as landlord. Thus, the defendant was not excused from tendering rent to the plaintiff, and the defendant breached the lease by failing to do so in accordance with paragraph six.

## III

We turn, then, to the dispositive issue in this appeal, namely, whether the trial court improperly found that the defendant was not entitled to retain possession of the leased premises under the doctrine of equitable nonforfeiture. The defendant contends that its conduct was neither wilful nor grossly negligent and that, in fact, the plaintiff's own conduct contributed to the defendant's failure to pay rent. The defendant also asserts that its losses upon eviction would be wholly disproportionate to the plaintiff's injury and that its actions demonstrated a good faith intent to comply with the lease and a good faith dispute over its meaning, particularly based on the defendant's well established course of dealings with House. We agree with the defendant.

We begin our analysis with the applicable standard of review. "Although we ordinarily are reluctant to inter-

fere with a trial court's equitable discretion . . . we will reverse where we find that a trial court acting as a court of equity could not reasonably have concluded as it did . . . or to prevent abuse or injustice." (Citations omitted.) *Fellows* v. *Martin*, 217 Conn. 57, 67–68, 584 A.2d 458 (1991); see also *Petterson* v. *Weinstock*, 106 Conn. 436, 446, 138 A. 433 (1927) ("[o]ur practice in this [s]tate has been to give a liberal interpretation to equitable rules in working out, as far as possible, a just result"). This case presents us with such a situation.

"[E]quitable defenses and counterclaims implicating the right to possession are available in a summary process proceeding. If, then, the tenant's equitable claim was properly raised, it was properly before the trial court." (Internal quotation marks omitted.) *Cumberland Farms, Inc.* v. *Dairy Mart, Inc.*, supra, 225 Conn. 777. In the present case, the defendant properly raised the issue in the trial court and, therefore, we proceed to consider it on appeal. Id.

"Equitable principles barring forfeitures may apply to summary process actions for nonpayment of rent if: (1) the tenant's breach was not [wilful] or grossly negligent; (2) upon eviction the tenant will suffer a loss wholly disproportionate to the injury to the landlord; and (3) the landlord's injury is reparable." Id., 778. Moreover, "[t]he doctrine against forfeitures applies to a failure to pay rent in full when that failure is accompanied by a good faith intent to comply with the lease or a good faith dispute over the meaning of a lease." (Internal quotation marks omitted.) Id. With these principles in mind, we address the defendant's argument.

## A

The defendant first claims that its breach of the lease by the nonpayment of rent was neither wilful[10] nor

---

[10] "Wilful misconduct has been defined as intentional conduct designed to injure for which there is no just cause or excuse. . . . [Its] characteristic element is the design to injure either actually entertained or to be implied

grossly negligent.[11] We agree with the defendant and conclude that its breach was instead the result of mere neglect. On the basis of the totality of the circumstances, such mere neglect does not bar the defendant from equitable relief, "when the delay has been slight, the loss to the lessor small, and when not to grant relief would result in such hardship to the tenant as to make it unconscionable to enforce literally the condition precedent of the lease." (Internal quotation marks omitted.) Id., 779.

The trial court concluded that the defendant's breach was wilful and grossly negligent. With respect to its determination that the defendant's breach was grossly negligent, the trial court improperly applied a heightened standard of care based solely on the defendant's status as a public water company. The relevant duty, for purposes of the test set forth in *Cumberland Farms, Inc.* v. *Dairy Mart, Inc.*, supra, 225 Conn. 778, is the tenant's duty to the landlord to pay rent as required by

---

from the conduct and circumstances. . . . Not only the action producing the injury but the resulting injury also must be intentional." (Citations omitted; internal quotation marks omitted.) *Dubay* v. *Irish*, 207 Conn. 518, 533, 542 A.2d 711 (1988). "[T]he term wilful has [also] been used to describe conduct deemed highly unreasonable or indicative of bad faith." *Saunders* v. *Firtel*, 293 Conn. 515, 531, 978 A.2d 487 (2009).

[11] We have defined gross negligence as "very great or excessive negligence, or as the want of, or failure to exercise, even slight or scant care or slight diligence . . . ." (Internal quotation marks omitted.) *Hanks* v. *Powder Ridge Restaurant Corp.*, 276 Conn. 314, 338, 885 A.2d 734 (2005); see also id., 352 (*Norcott, J.*, dissenting) ("[t]his court has construed gross negligence to mean no care at all, or the omission of such care which even the most inattentive and thoughtless seldom fail to make their concern, evincing a reckless temperament and lack of care, practically [wilful] in its nature" [internal quotation marks omitted]); 57A Am. Jur. 2d 296–97, Negligence § 227 (2004) (" 'Gross negligence means more than momentary thoughtlessness, inadvertence or error of judgment; hence, it requires proof of something more than the lack of ordinary care. It implies an extreme departure from the ordinary standard of care, aggravated disregard for the rights and safety of others, or negligence substantially and appreciably greater than ordinary negligence.").

the lease, not the tenant's duties to any third parties. See id., 779 (analyzing only relationship between landlord and tenant in affirming trial court's finding that tenant's negligence in making timely rent payments was mere neglect, and did not rise to level of gross negligence). It is clear, however, that the "critical duty" to which the trial court refers is the defendant's "responsibility to provide . . . safe drinking water" to its customers, rather than its obligations to House or the plaintiff to fulfill its contractual duties under the lease. Thus, in framing the defendant's duty as one owed to third parties—namely, its customers, rather than to House or the plaintiff—the trial court erred as a matter of law by applying a heightened standard of care in determining that the defendant's breach of the lease was grossly negligent. Instead, we apply the relevant duty of care, namely, the defendant's duty to House and the plaintiff to fulfill its contractual obligations under the lease.

In assessing whether the nature of a breach was wilful or grossly negligent, this court has found significant evidence of a landlord's own conduct contributing to a tenant's breach, such as when a landlord fails to give notice to a tenant of an assignment or of a change in ownership. For instance, in *Cumberland Farms, Inc.* v. *Dairy Mart, Inc.*, supra, 225 Conn. 779, this court held that the tenant's breach for nonpayment of rent was not wilful or grossly negligent because, inter alia, "[t]he [landlord's] conduct contributed significantly to the delayed payment of rents and taxes," when "there was confusion about the identity of the landlord and where to send rental payments"; id., 777; because the landlord "had never given formal notice to the [tenant] of the assignment of the sublease or the change in landlords under the sublease." Id.

In the present case, as in *Cumberland Farms, Inc.*, the plaintiff's own actions contributed significantly to

the defendant's failure to tender rent. The plaintiff failed to notify the defendant that the plaintiff had become the record owner of the premises or to provide the address where rent payments should be sent. The trial court itself acknowledged that the plaintiff "could have contacted the [defendant] and informed [it] of [the plaintiff's] acquisition of title to the premises . . . ." Whatever the reason, the plaintiff neglected to perform this simple task. For its part, the defendant exercised reasonable diligence in searching the Farmington land records to ascertain the identity of the landlord. On the basis of the evidence in the record, the defendant's failure to find the plaintiff's certificate of foreclosure in those land records does not rise to the level of wilful or grossly negligent conduct.

The plaintiff, nevertheless, contends that the defendant's breach was wilful and grossly negligent because the defendant failed to pay rent for such an extended period of time—approximately thirty-one months. Although this is a considerable amount of time, in this context it was not tantamount to wilfulness or gross negligence, in light of the fact that the lease itself was for a term of ninety-nine years. See *Fellows* v. *Martin*, supra, 217 Conn. 59–60, 67 (granting tenant equitable relief from forfeiture when landlord claimed tenant breached ninety-nine year lease by failing to pay full rent because breach was caused by good faith dispute over meaning of lease and forfeiture would cause injury to tenant wholly disproportionate to landlord's injury). Further, "time is not essential where there is mere neglect . . . ." (Internal quotation marks omitted.) *F. B. Fountain Co.* v. *Stein*, 97 Conn. 619, 626, 118 A. 47 (1922). Moreover, it appears from the record that the defendant understandably, even if incorrectly, believed that paragraph six of the lease did not apply, as the parties had yet to invoke that provision and, therefore, that no lease payments actually were due. This belief,

although erroneous, is more akin to a mistake of law, rather than the type of wilfulness that would preclude equitable relief. See *Fellows* v. *Martin*, supra, 68 ("we have specifically held that a court of equity may grant relief from a forfeiture when the defendant's omission was caused by an error of law").

Additionally, as early as 2004, the defendant began to accumulate funds as a contingency plan to cover cash payments in the event that any new owner decided that paragraph six of the lease had been triggered. Setting aside, or stockpiling funds in the event they became due contraindicates any intentional or purposeful failure to pay rent, or any claim of gross negligence on the part of the defendant. See *Thompson* v. *Coe*, 96 Conn. 644, 657, 115 A. 219 (1921) ("[t]he conduct of the [tenant in sending the money as he did] after he was informed of the nonpayment . . . is conclusive of the good faith of the [tenant] . . . and his continuous desire to avoid a forfeiture"); see also *Bray* v. *Bray*, 51 Conn. Sup. 133, 145, 978 A.2d 582 (2008) ("[m]any courts have also taken into consideration the tenant's actions after receiving notice by the landlord of the termination of the lease, looking favorably on any actions by the tenant to cure the default or evidencing an intent to prevent the forfeiture"). The defendant's breach of the lease was, therefore, neither wilful nor grossly negligent.

B

The defendant next claims that its losses upon eviction would be wholly disproportionate to the plaintiff's injury. The trial court found that the plaintiff's injury consists entirely of approximately $60,000 in unpaid rent, based on the defendant's calculations under the terms of the lease, had paragraph six been triggered after House had ceased operations. Moreover, the defendant has made clear that it is willing to pay this amount to the plaintiff. Thus, the trial court properly

found that the plaintiff's injury is reparable, in satisfaction of the third prong of the test set forth in *Cumberland Farms, Inc.* v. *Dairy Mart, Inc.*, supra, 225 Conn. 778. In contrast, the defendant's losses upon eviction will be considerable as it will need to replace the approximately 1,500,000 to 2,000,000 gallons of water per day that it pumps from the well field on the premises. Its eviction would, therefore, jeopardize approximately one half of Unionville's daily water supply.

The trial court stated that, if the defendant is evicted, it "will either continue in possession of the premises and initiate eminent domain proceedings, or extract the needed water from another source." The trial court underestimates the defendant's losses. There is no evidence in the record that the defendant could simply "extract the needed water from another source"; however, even if another source of water exists, it is not at all clear that a new source would yield a comparable volume and quality of water or that it would continue to do so for a length of time equivalent to the more than sixty years remaining on the lease. Additionally, the defendant would lose the benefit of all of the capital investments that allow it to extract water from the premises, including the wells, which have been registered and permitted for its sole use. See *Cumberland Farms, Inc.* v. *Dairy Mart, Inc.*, supra, 225 Conn. 779–80 ("[T]he [tenant's] interest, in the event of forfeiture, included the value of the option to purchase the premises and the value of capital improvements it had made to the premises. . . . Moreover, the [tenant] had made a substantial investment in the leasehold . . . by having improved the premises . . . ." [Citation omitted; internal quotation marks omitted.]).

Moreover, the trial court overvalued the extent to which the eminent domain process would mitigate the defendant's loss. The defendant would not incur just "some expense," as the trial court suggested, but signifi-

cant expenses in prosecuting an eminent domain action. These expenses would include both legal and expert fees as well as just compensation for the taking. Further, pursuant to General Statutes § 25-42,[12] the defendant's application for a taking would require it to prove its taking is "necessary" to maintain the water supply, and that "alternative means of supplying pure water . . . are not reasonably available or feasible . . . ." The possibility remains that a court would not approve the application. If that were the case, it is indisputable that the harm to the defendant in losing access to between 1,500,000 and 2,000,000 gallons of water each day would far exceed the plaintiff's injury. Accordingly, although Radka testified that he would advocate for instituting eminent domain proceedings if the defendant had to quit possession, the time, expense and considerable uncertainty of such proceedings would far outweigh the plaintiff's reparable injury of $60,000 in rental arrearage. Thus, regardless of whether the defendant "will either continue in possession of the premises and initiate eminent domain proceedings, or extract the needed water from another source," its losses upon eviction would be wholly disproportionate to the plaintiff's injury.

C

Finally, the defendant claims that it had a good faith dispute over the meaning of the lease and that it made a good faith effort to comply with that lease. We agree

[12] General Statutes § 25-42 provides in relevant part: "Any . . . corporation authorized by law to supply the inhabitants of any town, city or borough with pure water for public or domestic use may take and use such lands, springs, streams or ponds, or such rights or interests therein, as the Superior Court . . . on application, deems *necessary* for the purposes of such supply. The court shall approve or disapprove such taking and use after review of the applicant's analysis of future water supply demands and a determination that *alternative means of supplying pure water*, including, but not limited to, interconnections to other existing supply systems or a program of demand management, *are not reasonably available or feasible* to meet such demands . . . ." (Emphasis added.)

with the defendant. "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . Bad faith means more than mere negligence; it involves a dishonest purpose." (Internal quotation marks omitted.) *De La Concha of Hartford, Inc.* v. *Aetna Life Ins. Co.*, 269 Conn. 424, 433, 849 A.2d 382 (2004). Thus, an honest mistake, incorrect interpretation or mere difference in the parties' interpretations of a contract does not amount to bad faith conduct without an associated " 'dishonest purpose.' " Id. Similarly, simply failing to pay rent does not constitute bad faith; such failure to pay rent must be "prompted by . . . [a] sinister motive [or] dishonest purpose." (Internal quotation marks omitted.) Id. Accordingly, the trial court improperly equated the defendant's incorrect interpretation of the lease and its corresponding failure to pay rent with bad faith.

Despite its flawed interpretation of the amended paragraph five, it is clear from the record that the defendant believed, in good faith, that it was properly operating under an existing lease and a customary course of dealing with House by applying water bill credits through 2004, when it no longer could contact House. Although incorrect, it was not unreasonable for the defendant to believe that such course of dealing would continue after 2004 and remain so with any new landlord. In correspondence, when the plaintiff approached the defendant stating that the plaintiff was likely to be the new landlord, the defendant expressed its expectation that the parties would operate under the existing lease. Moreover, the defendant requested that the plaintiff notify it were the plaintiff to become the record owner, and in the event that the plaintiff

chose to change the form of rental payment from water bill credits to cash. Even after so informing the plaintiff, the defendant monitored the land records to see whether title had passed from House. That the defendant failed to find the plaintiff's certificate of foreclosure in the land records does not indicate bad faith, especially given that the defendant also began to set aside funds to pay rent should a new owner request cash payments. Additionally, once the defendant received notice of the plaintiff's acquisition of title to the premises by means of the notice to quit, the defendant approached the plaintiff to discuss paying back the rent owed to the plaintiff. See *Thompson* v. *Coe*, supra, 96 Conn. 657 ("[t]he conduct of the [tenant in sending the money as he did] after he was informed of the nonpayment . . . is conclusive of the good faith of the [tenant] . . . and his continuous desire to avoid a forfeiture"). The defendant has maintained that it is ready and willing to pay the plaintiff for the rent due. The plaintiff, however, refused even to acknowledge that there was a lease, initially only admitting to the "claim of a lease,"[13] and rejected the defendant's entreaty. All of these actions on the part of the defendant demonstrate that it had a good faith dispute over the meaning of the lease and had a good faith intent to comply with that lease.

Thus, although we agree with the plaintiff that the trial court properly interpreted paragraph five of the lease, and that the defendant breached the lease by failing to tender rent, we conclude that the trial court improperly concluded that the defendant was not entitled to remain in possession of the portion of the premises covered under the lease under the doctrine of

---

[13] In addition to the nonpayment of rent, the plaintiff's notice to quit claimed as a reason for the defendant to quit possession that it had "[n]o right or [privilege] to occupy such premises . . . ." The trial court rejected this claim, and the plaintiff has not challenged this determination on appeal.

equitable nonforfeiture, conditioned upon the defendant's timely payment of any arrearage plus interest and costs found on remand to be due to the plaintiff.

The judgment is reversed and the case is remanded to the trial court for further proceedings in accordance with the preceding paragraph of this opinion.

In this opinion the other justices concurred.