******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

HEYMAN ASSOCIATES NO. 5, L.P., ET AL.
*v.* FELCOR TRS GUARANTOR, L.P.
(AC 35868)

Lavine, Keller and Mihalakos, Js.

*Argued May 29—officially released October 7, 2014*

(Appeal from Superior Court, judicial district of Stamford-Norwalk, Hon. Taggart D. Adams, judge trial referee.)

*Robert M. Shields*, *Jr.*, with whom were *Kenneth J. Bartschi* and, on the brief, *Wesley W. Horton*, for the appellant (defendant).

*Marc J. Kurzman*, with whom were *Brian A. Daley* and, on the brief, *Peter M. Nolin*, for the appellees (plaintiffs).

*Opinion*

LAVINE, J. This case concerns the validity and enforceability of a restrictive covenant prohibiting certain premises from being operated as an "upscale hotel." The defendant, FelCor TRS Guarantor, L.P., claims that the restrictive covenant was extinguished as a result of certain land transfers, and thus appeals from the judgment of the trial court in favor of the plaintiffs, Heyman Associates No. 5, L.P. (Heyman), HD Hotel, LLC (HD Hotel), AIM Management Corporation (AIM), and TRJ II (TRJ).[1] On appeal, the defendant claims that the trial court improperly (1) failed to determine that the restrictive covenant was merged out of existence,[2] (2) found that the plaintiffs and HD Hotel had standing to enforce the restrictive covenant, and (3) awarded the plaintiffs attorney's fees. We affirm the judgment of the trial court.

The following facts, as found by the trial court in a comprehensive memorandum of decision, and procedural history are relevant to the resolution of this appeal. In 1996, the plaintiffs owned two hotels in Stamford located two city blocks apart: one was a Marriott, which catered to an upscale market; the other, a Ramada Inn, focused on the midscale market. The hotels were owned by two separate business entities each comprised of the Heyman, Meyer, and Jabara families.[3] The Stamford Marriott (Marriott) charged higher room rates and provided superior service as compared to the Ramada Inn, but because each hotel catered to a different clientele, the hotels were complementary, and did not impinge on one another's business. Richard Jabara, principal for TRJ, testified that if a large company needed hotel rooms in Stamford for a conference, the plaintiffs could accommodate the salesmen in the Ramada Inn and the executives in the Marriott.[4]

Shortly after the plaintiffs acquired the Ramada Inn in 1996, Holiday Inns, Inc. (Holiday Inn), expressed an interest in purchasing the Ramada Inn. As a condition of selling the premises to Holiday Inn, the plaintiffs required the imposition of a restrictive covenant prohibiting Holiday Inn from operating the premises as an upscale hotel. The purpose of the restrictive covenant was to protect the business of the Marriott, which the plaintiffs owned. Following a brief period of negotiation, Timothy Lane, chief executive officer of Holiday Inn, assured Jabara that the premises would be run as a midscale hotel, such as a Holiday Inn.[5]

In a memorandum dated June 5, 1996, Lane outlined the nature of the transaction to the executive committee of Bass PLC:[6] "[The premises] [were] purchased most recently by the Meyer and Jabara Hotel Group . . . who had previously purchased and renovated the . . . Marriott. . . . [Holiday Inn] was offered the asset for $8.3 [million] with a deed restriction barring upscale

branding, including Crowne Plaza, for a term of 15 years. . . . The [fifteen year] deed restriction against branding of the hotel as an upscale brand could limit sale options in the future, but is not considered a significant concern."

The plaintiffs and Holiday Inn reached an agreement[7] on the sale of the premises on June 21, 1996, and the closing occurred on July 12, 1996. On July 12, 1996, the plaintiffs transferred their land interests in the premises, which included a sublease interest to a large parcel of land and a fee interest to a small parcel, to Holiday Inn.[8] The sublease interest was transferred pursuant to a sublease assignment agreement, and the fee interest was transferred by way of a limited warranty deed. Both the sublease assignment agreement and the limited warranty deed contained a restrictive covenant, prohibiting Holiday Inn from using the premises to operate an "upscale hotel."

The transaction included a second phase as well. The sublease, which the plaintiffs transferred to Holiday Inn on July 12, 1996, was governed by a ground lease in favor of a third party, TK Associates. On July 22, 1996, the plaintiffs acquired the ground lease from TK Associates, and transferred the ground lease to Holiday Inn on July 27, 1996, by way of a ground lease assignment agreement. Under the terms of the ground lease assignment agreement, the parties agreed that the sublease and ground lease interests would merge. No restrictive covenant was included in the ground lease assignment agreement. Following the sale of the premises, the plaintiffs dissolved the business entity that owned the premises, i.e., BRS Realty Associates, LLC (BRS).

In conformity with the restrictive covenant, Holiday Inn converted the premises into a Holiday Inn Select. In 1997, Holiday Inn merged with the Bristol Hotel Company, which in turn merged with FelCor Lodging Trust in 1998. In 2005, the ground lease for the premises was transferred to the defendant, a taxable real estate investment trust. There is no dispute on appeal that the defendant is Holiday Inn's corporate successor, and that the defendant assumed Holiday Inn's contractual obligations.[9]

At trial, Jabara testified that in 1999, he received a telephone call from Thomas Corcoran, the chairman or president of the defendant, who requested that the restrictive covenant be lifted so that the premises could be used as a Crowne Plaza—an upscale hotel. Jabara testified that he rejected the request after consulting with the other plaintiffs. According to Jabara, Corcoran made a similar request in late 2005, but the plaintiffs denied it.

In 2005, the defendant received an offer to purchase the premises from Destination Hotel and Resorts for $30 million. This offer, however, was withdrawn when

Destination Hotel and Resorts learned of the restrictive covenant. In response, the defendant consulted with Garret Delehanty, Jr., a real estate attorney. Delehanty advised the defendant that there was a "good argument" to be made that the restrictive covenant in the sublease was merged out of existence when the sublease interest merged with the ground lease. Delehanty offered to record a document on the Stamford land records that stated that the restrictive covenant was "terminated." On May 25, 2006, the defendant recorded a document entitled "Termination" on the Stamford land records without notice to the plaintiffs.

The plaintiffs learned of the termination filing after they discovered marketing materials associated with the premises, which informed prospective buyers that "ownership recently took steps . . . [and] eliminated a use restriction (which historically impaired the ability to re-brand with most upscale brands)." The plaintiffs thereafter sent written objections to the defendant concerning the attempted termination of the restrictive covenant, and requested that the termination document filed in the Stamford land records be withdrawn. The defendant did not withdraw the termination document.

On July 12, 2006, the plaintiffs and HD Hotel commenced this action seeking a declaratory judgment that the restrictive covenant was valid, binding, and enforceable. The operative complaint consisted of four counts. In the first count, the plaintiffs sought a declaratory judgment that (1) the termination document filed on the land records was null and void, and (2) the restrictive covenant was valid, effective, and enforceable. In the second count, HD Hotel sought a declaratory judgment that it was the intended beneficiary of the restrictive covenant, and that it was entitled to enforce the restriction. In count four, both the plaintiffs and HD Hotel alleged that they were entitled to an award of attorney's fees pursuant to provisions in the sublease assignment agreement and the ground lease assignment agreement.[10]

The defendant denied the material allegations of the complaint and raised several special defenses including that (1) the plaintiffs lacked standing to enforce the restrictive covenant, and (2) the restrictive covenant had been "merged out of existence." In addition, by way of a counterclaim, the defendant alleged (1) tortious interference with contract or business expectations, (2) slander of title, and (3) a violation of the Connecticut Unfair Trade Practices Act. By agreement the trial was bifurcated. Trial on the issues raised by the complaint and the defendant's special defenses commenced on April 17, 2012. Following the presentation of evidence, the parties submitted posttrial memoranda, and on November 9, 2012, the court filed its memorandum of decision.

In a thorough and persuasive memorandum of deci-

sion, the court found in favor of the plaintiffs on their and HD Hotel's declaratory judgment claims. The court found the plaintiffs had standing to enforce the restrictive covenant. The court also found that HD Hotel, as owner of the Marriott, had standing as the intended beneficiary of the restrictive covenant.

The court found that the restrictive covenant was valid and enforceable. The court rejected the defendant's argument that the restrictive covenant was "merged out of existence," concluding that "the language [that merged the sublease into the ground lease], while clear as far as it goes, says nothing about the [restrictive covenant], and is ambiguous as to its intended effect, if any, on that restriction." The court determined that extrinsic evidence supported "the firm conclusion that neither BRS nor [Holiday Inn] had any intent to terminate the use restriction on the hotel parcel of land when they executed the ground lease agreement."

After the court found in favor of the plaintiffs and HD Hotel on their declaratory judgment claims, the plaintiffs filed a motion for attorney's fees. On June 27, 2013, the court filed a separate decision and awarded attorney's fees and legal costs to the plaintiffs in the amount of $1,507,266.04. The plaintiffs moved for judgment to be rendered in their favor, but before the court ruled on that motion, this appeal was filed.[11]

I

The defendant first claims that the trial court improperly determined that the plaintiffs had standing to enforce the restrictive covenant. The defendant states that none of the parties were "signatories or otherwise named in any of the crucial documents" and that no party was expressly named as a third party beneficiary. Specifically, the defendant contends that upon the dissolution of BRS, the plaintiffs were divested of all rights and title in the premises, and that HD Hotel was not an intended third party beneficiary of the restrictive covenant. We disagree with the defendant.

It is well established that "[s]tanding is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he [or she] has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . Nevertheless, [s]tanding is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. . . . If a party is found to lack standing,

the court is without subject matter jurisdiction to determine the cause. . . . A determination regarding a trial court's subject matter jurisdiction is a question of law. When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Citation omitted; internal quotation marks omitted.) *Fairchild Heights Residents Assn., Inc.* v. *Fairchild Heights, Inc.*, 310 Conn. 797, 820, 82 A.3d 602 (2014).

## A

We begin by analyzing whether the plaintiffs have standing to prosecute this action. The trial court determined that although BRS had been dissolved, "the right to enforce the use restriction passed to [the plaintiffs] by operation of [General Statutes] § 34-210."[12]

The defendant contends that the restrictive covenant did not pass to the plaintiffs. This argument rests, in part, on the testimony at trial of James Mazzeo, formerly the chief financial officer of BRS. Mazzeo testified that BRS never listed the restrictive covenant as an asset of BRS nor assigned the restrictive covenant a cash value. Seizing on this fact, coupled with the fact BRS never granted its members the right to continue BRS' business following its dissolution, the defendant maintains that "the former members of BRS acquired no interest of their own in the restrictive covenant, and therefore lacked standing to enforce it."

On the basis of our plenary review of the record, we conclude that the trial court properly determined that the plaintiffs have standing. In effect, the defendant's argument invites this court to conclude, essentially, that the plaintiffs had abandoned their interest in the restrictive covenant following the dissolution of BRS, or that it simply evaporated. We decline this invitation. The mere fact that some assets of BRS were not formally assigned or transferred does not mean that they have disappeared or that they did not pass to its members. This is particularly true given that the restrictive covenant at issue in this case was of considerable value to the plaintiffs as owners of the Marriott. See generally *Torrington Creamery* v. *Davenport*, 126 Conn. 515, 521, 12 A.2d 780 (1940) (recognizing restrictive covenant as "valuable asset" whose benefits may be assigned).

Upon the dissolution and winding-up of BRS, the restrictive covenant passed to the plaintiffs. Pursuant to § 34-210, following the satisfaction of its creditors, the assets of a limited liability company are ultimately transferred to its former members. In the context of corporate law, the general rule is that "[w]hen a corporation is dissolved and its affairs wound up, such assets as remain, after the satisfaction and discharge of all liabilities and obligations, belong to the shareholders." M. Ford, Connecticut Corporation Law & Practice (2d

Ed. 2000) § 4.01 (C), p. 4-12; see also *Mukon* v. *Gollnick*, 151 Conn. App. 126, 131–32, A.2d (2014);[13] *Haddad* v. *Francis*, 40 Conn. Supp. 567, 572–73, 537 A.2d 174, 177 (1986), aff'd, 13 Conn. App. 324, 536 A.2d 597 (1988).

Accordingly, even if the restrictive covenant was not explicitly transferred out of BRS at the time of dissolution, it is apparent that the restrictive covenant passed to the plaintiffs as its former members by operation of law. Therefore, the plaintiffs have standing to enforce the restrictive covenant.

B

We now turn to the defendant's contention that HD Hotel lacks standing as a third party beneficiary to bring this action. The trial court found that HD Hotel owned the Marriott and that the "[t]here was substantial and uncontradicted testimony that the purpose of the use restriction was to protect the business of the . . . Marriott." The defendant contends that this finding is unsupported by the evidence because there is no evidence "that Holiday Inn or its attorneys knew that HD Hotel even existed as a specific entity," and that the finding is improperly based on the trial court's focus on the Heyman, Jabara, and Meyer families. We disagree.

Our Supreme Court has stated: "Under the third party beneficiary doctrine, [t]he ultimate test to be applied [in determining whether a person has a right of action as a third party beneficiary] is whether the intent of the parties to the contract was that the promisor should assume a direct obligation to the third party [beneficiary] . . . . [*T*]*hat intent is to be determined from the terms of the contract read in the light of the circumstances attending its making, including the motives and purposes of the parties.* . . . [I]t is not in all instances necessary that there be express language in the contract creating a direct obligation to the claimed third party beneficiary . . . ." (Emphasis added; internal quotation marks omitted.) *Wykeham Rise, LLC* v. *Federer*, 305 Conn. 448, 474, 52 A.3d 702 (2012).

On the basis of our review of the record, we conclude that the trial court properly determined that HD Hotel had standing to bring this action. In this case, there was uncontradicted evidence that the intended beneficiary of the restrictive covenant was the Marriott, and that the restrictive covenant was meant to protect the business interests of the plaintiffs as its owners. The evidence indicated that the Marriott was owned by HD Hotel, whose membership was comprised of the plaintiffs.

The defendant contends that Holiday Inn was not explicitly aware that HD Hotel owned the Marriott when the restrictive covenant was executed. This argument elevates form over substance. It is apparent that the defendant clearly understood who owned the Marriott.

In 1999 and 2005, when the defendant wanted to have the restrictive covenant removed, the defendant knew exactly whom to contact and discussed the request with Jabara. We agree with the trial court that "[t]here was substantial and uncontradicted testimony that the purpose of the [restrictive covenant] was to protect the business of the . . . Marriott." This testimony included that of David Sinyard, who as the trial court noted, "described himself as the 'lead deal guy' for [Holiday Inn] in connection with its 1996 purchase of the [premises]," and who testified that "[Holiday Inn] agreed to the restriction, knew it was for the benefit of the . . . Marriott, and was 'fine with it'. . . ."

On the basis of the entire record, it is clear that the Marriott was an intended beneficiary of the restrictive covenant and that, HD Hotel, as the owner of Marriott, has standing to enforce the restrictive covenant.

II

We now address the defendant's claim that the trial court improperly determined that the restrictive covenant was not merged out of existence when the sublease interest was merged with the ground lease interest.

A review of the relevant facts is necessary for the resolution of this claim. In the summer of 1996, the sale of the premises from the plaintiffs to Holiday Inn was governed by a purchase and sale agreement that was executed on June 21, 1996. The agreement contemplated a two phase transaction. In the first phase, the agreement provided that the plaintiffs were to transfer their interests in the premises. These interests included a sublease interest to the main parcel on which the hotel structure rested, and a fee interest to a separate smaller parcel that included the premises' front landscape. The agreement granted the plaintiffs the right to include in both the sublease assignment agreement and the limited warranty deed to the fee parcel, a restrictive covenant that precluded the premises from being used for an upscale hotel. This first phase was completed when the plaintiffs transferred the sublease interest pursuant to a sublease assignment agreement and the fee interest under a limited warranty deed on July 12, 1996, both of which included the restrictive covenant.[14]

The agreement recognized that the sublease was governed by a ground lease in favor of a third party, TK Associates, and therefore contemplated a second phase: if the plaintiffs acquired the ground lease from TK Associates within twelve months, the plaintiffs were obligated to assign that interest to Holiday Inn in exchange for $1.6 million. On July 15, 1996, the plaintiffs acquired the ground lease from TK Associates, and, pursuant to the agreement, assigned the ground lease to Holiday Inn on July 31, 1996. The assignment of the ground lease was accomplished by a ground lease assignment agreement, which not only transferred the ground lease

to Holiday Inn, but also operated to merge the sublease interest with the ground lease interest.

Paragraph 6 of the ground lease assignment agreement provided: "By and upon delivery of this Assignment by Assignor to Assignee, all of the right, title, interests and estate created by or under the Sublease are automatically fully merged and subsumed into the estate and interests held by Assignee under the Lease, Assignee hereby declaring its express intent to accomplish such merger so that from and after the date hereof neither the Sublease nor the estate created thereunder shall have any further existence and Assignee's interest in the Property shall be solely and exclusively the leasehold estate under the Lease acquired by Assignee hereunder and created by the Lease, the same being the interest and estate of Assignee as lessee under the Lease. *The Sublease and interests and estates thereunder are hereby fully and completely merged, and declared to be merged, out of existence, without the necessity of any further action by any party.*" (Emphasis added.)

We turn now to the defendant's claim on appeal. The parties are in agreement that paragraph 6 of the ground lease assignment agreement (paragraph 6) operated to merge the sublease estate with the ground lease. The parties disagree, however, as to the effect of paragraph 6 on the restrictive covenant. The defendant contends that the language at issue unambiguously merged the sublease estate—and all interests thereunder, including the restrictive covenant—out of existence. The plaintiffs, on the other hand, argue that the language of paragraph 6 is ambiguous as to its impact on the restrictive covenant. The plaintiffs contend that given this ambiguity, the trial court properly considered extrinsic evidence when it found that the parties never intended to extinguish the restrictive covenant. We agree with the plaintiffs.

It is well established that the determination of whether language of a contract is plain and unambiguous "is a question of law subject to plenary review." *Cruz* v. *Visual Perceptions, LLC*, 311 Conn. 93, 101, 84 A.3d 828 (2014). If, however, the contractual language is found to be ambiguous, "[s]uch ambiguity permits the trial court's consideration of extrinsic evidence as to the conduct of the parties. . . . [T]he trial court's interpretation of a contract, being a determination of the parties' intent, is a question of fact that is subject to reversal on appeal only if it is clearly erroneous." (Citation omitted; internal quotation marks omitted.) *19 Perry Street, LLC* v. *Unionville Water Co.*, 294 Conn. 611, 623, 987 A.2d 1009 (2010). Accordingly, our review is twofold. First, we must determine de novo whether the contractual language is ambiguous. If we conclude that it is, we must determine whether the trial court's factual finding are clearly erroneous.

"In determining whether a contract is ambiguous, the words of the contract must be given their natural and ordinary meaning. . . . A contract is unambiguous when its language is clear and conveys a definite and precise intent. . . . The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity. . . . Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . .

"In contrast, a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . [A]ny ambiguity in a contract must emanate from the language used by the parties. . . . The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so. . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." (Citations omitted; internal quotation marks omitted.) *Cruz* v. *Visual Perceptions, LLC*, supra, 311 Conn. 102–103.

Our examination of paragraph 6 convinces us that it is not clear and unambiguous. Whereas the very *first* sentence of that paragraph states that "[upon this assignment] all of the right, title, interests and estate created by or under the Sublease are automatically *fully merged and subsumed into the estate and interests* [*under the ground lease*]," the very *last* sentence of paragraph 6 states that "[t]he Sublease and interests and estates thereunder are hereby fully and completely merged, and declared to be *merged, out of existence* . . . ." (Emphasis added.)

The defendant's interpretation unduly focuses on the very last sentence of paragraph 6, which states that the sublease and interests thereunder were merged out of existence, and ignores the broader context of the transaction. The defendant contends that this sentence clearly and unequivocally evidences the parties' intent to extinguish the restrictive covenant. This sentence, however, is in conflict with the first sentence of paragraph 6, which states that the sublease and its interests are "subsumed" by the ground lease. Therefore, it appears that paragraph 6 is open to two reasonable interpretations: one in which the restrictive covenant is *extinguished;* the other in which it is *subsumed* by the ground lease. These contradictory sentences—coupled with the fact that neither specifically references the restrictive covenant—leads us to the conclusion that paragraph 6 does not plainly and unambiguously support the defendant's contention that the restrictive covenant was merged out of existence or the plaintiffs' position that it was not.

We are unable to reconcile these two sentences.

Accordingly, on the basis of our plenary review, we conclude that the language of paragraph 6 is ambiguous because it is susceptible to more than one reasonable interpretation. See *United Illuminating Co.* v. *Wisvest-Connecticut, LLC*, 259 Conn. 665, 671, 791 A.2d 546 (2002). Therefore, we must determine whether the trial court's finding that paragraph 6 did not merge the restrictive covenant out of existence is clearly erroneous.

"[T]he trial court's interpretation of a contract, being a determination of the parties' intent, is a question of fact that is subject to reversal on appeal only if it is clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; internal quotation marks omitted.) *19 Perry Street, LLC* v. *Unionville Water Co.*, supra, 294 Conn. 623–24.

In finding that paragraph 6 did not merge the restrictive covenant out of existence, the trial court considered the following evidence. The court first noted the importance of the restrictive covenant to the entirety of the sale. The court found that principals of both the plaintiffs and Holiday Inn understood that the restrictive covenant was an essential component to the overall transaction. The court credited Jabara's testimony that the restrictive covenant was an essential condition of the sale of the premises to Holiday Inn and quoted the Lane memorandum before finding that Holiday Inn "clearly understood" the importance of the restrictive covenant.

The court also examined the purchase and sales agreement. It noted that the purchase and sales agreement governed the entire transaction, and that "[t]here was no mention that upon assignment of the ground lease [to Holiday Inn] the carefully negotiated [restrictive covenant] would disappear." The court also noted that the ground lease assignment agreement, which the defendant claimed to have merged the restrictive covenant out of existence, did not reference the limited warranty deed that contained an identical restrictive covenant.

The court next concluded that the testimony and depositions of representatives from both the plaintiffs and Holiday Inn who were involved with the transaction "consistently supported" an intent that the ground lease assignment agreement was not intended to extinguish the restrictive covenant. This testimony included that of Kathleen Rorick, the executive vice president of Heyman Properties, who testified that she had "no authority from [the plaintiffs] to terminate the [restrictive covenant]," "did not intend to do so," and "understood at the time that the ground lease assignment [agreement]

did not do so." Tamara Levine, an attorney who represented the plaintiffs in connection with the transaction, testified that "the ground lease assignment [agreement] was to have no effect on the [restrictive covenant], and there was no intent to have the ground lease assignment [agreement] affect the restriction."[15]

The court noted that a similar intent was evidenced by Holiday Inn's agents. The court recounted: "Sinyard, who headed up the transaction for [Holiday Inn], testified at a deposition that [Holiday Inn] agreed to the [restrictive covenant], understood it was to protect another hotel in the area owned by the sellers, and stated [that] [Holiday Inn] had no intention of making the hotel it was acquiring into an 'upscale' hotel, but was satisfied to call it a Holiday Inn. He testified [that] he was unaware of any agreement by which that restriction was terminated. He further testified that he had not authorized its termination, and since the restrictive covenant was a significant aspect of the transaction, the termination of it less than a month thereafter would have been brought to his attention. Attorney Timothy Packenham, a commercial real estate lawyer with the law firm Alston & Bird that acted as [Holiday Inn's] outside counsel in connection with its purchase of the hotel, drafted the ground lease assignment [agreement], and he had no knowledge of any [Holiday Inn] intent with respect to that document except to acquire the ground leasehold interest, and [did] not recall any intent one way or another about terminating the [restrictive covenant]." (Citations omitted.)

On the basis of these findings, the court came to "the firm conclusion that neither [the plaintiffs] nor [Holiday Inn] had any intent to terminate the [restrictive covenant] on the hotel parcel of land when they executed the ground lease assignment [agreement]. There is no evidence of such intent and such an intent seems to be an implausible change of direction by the parties who knew about the distinct possibility of the ground lease assignment when the [purchase and sales agreement] was signed on June 21, 1996, and when the deed and sublease assignment documents, all containing the restriction, were signed on July 12, 1996. There is no evidence of any event or change of heart occurring within the nineteen day period extending to July 31, 1996, to provide a basis for the court to determine that the [restrictive covenant] was intended by the parties to be undone, so that the language of the ground lease assignment [agreement] should be construed to effect a termination of the [restrictive covenant], and the court declines to do so."

Having reviewed the record and evidence, we conclude that it overwhelmingly indicates that the parties never intended to extinguish the restrictive covenant. The defendant's interpretation rests on its laser like focus on a single sentence of the ground lease assign-

ment agreement, and its contention that this sentence indicates that the parties' intended to undo a fundamental aspect of the transaction. This position does not make sense when one considers the transaction as a whole, which was neatly governed by the purchase and sales agreement. There is no evidence in the plain language of purchase and sales agreement indicating that the parties intended to extinguish the restrictive covenant upon the transfer of the ground lease, even though the purchase and sales agreement contemplated the ground lease assignment agreement.

On the basis of our review of the record, we simply cannot conclude that the trial court's findings were without support in the record, nor are we "left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *19 Perry Street*, LLC v. *Unionville Water Co.*, supra, 294 Conn. 624. Accordingly, we conclude that the trial court's determination that the restrictive covenant was not merged out of existence is not clearly erroneous.

### III

The defendant next claims that the court improperly granted the plaintiffs an award of attorney's fees. Specifically, the defendant contends that the court improperly determined that (1) the plaintiffs were contractually entitled to attorney's fees, (2) the defendant's breach of the restrictive covenant triggered an award of attorney's fees, and (3) the plaintiffs had standing to pursue attorney's fees because the plaintiffs did not pay for the cost of the litigation. We disagree.

The following facts are relevant to this claim. In the fourth count of their amended complaint, the plaintiffs and HD Hotel alleged that they were entitled to reasonable attorney's fees and expenses arising out of the defendant's breach of the restrictive covenant. After the court found that the restrictive covenant was enforceable, the plaintiffs filed a motion for attorney's fees and litigation expenses.

The plaintiffs claimed entitlement to attorney's fees on the basis of the sublease assignment agreement,[16] which provided: "[Holiday Inn] agrees to and does hereby indemnify and hold [BRS] harmless hereunder from all claims, demands, losses, damage, expenses and costs including, but not limited to, reasonable attorney's fees and expenses arising out of or in connection with [Holiday Inn's] failure, from and after delivery of this instrument, to observe, perform and discharge on time each and every one of the covenants, obligations and liabilities assumed by [Holiday Inn] in this instrument relating to, or accruing with respect to the period from and after, not before the date hereof."

In their motion for attorney's fees the plaintiffs claimed, inter alia, that the defendant's filing the termination notice on the Stamford land records was a repu-

diation of the restrictive covenant. The plaintiffs sought $1,507,266.04 in attorney's fees and expenses for an expenditure of over 4000 hours of attorney time in the prosecution of the declaratory judgment action.

The defendant opposed the plaintiffs' motion for attorney's fees, and claimed that an award of attorney's fees was not supported because (1) there was no contractual or statutory basis for doing so, (2) the defendant had not breached any contractual agreement, (3) the plaintiffs lacked standing to seek attorney's fees because HD Hotel ultimately paid the bills, and (4) the amount of recovery sought was unreasonable and unfair.

On June 27, 2013, the court filed its memorandum of decision and awarded the plaintiffs attorney's fees and litigation costs in the amount of $1,507,266.04. The court found that "the actual language of the contractual provisions in the [sublease assignment agreement] and [ground lease assignment agreement] that comprise the undertaking to pay attorney's fees make no specific reference that they are, as [the defendant] has urged, limited only to such instances where a third party has sued BRS. . . . Under these agreements, [Holiday Inn], and subsequently [the defendant], obligated itself to pay to BRS all expenses and costs BRS incurred, including attorney's fees arising from [the defendant's] breach of the restrictive covenant." The court also found that the defendant had breached the restrictive covenant by filing the termination notice on the Stamford land records and that the plaintiffs had standing to pursue the claim for attorney's fees.

A

We first analyze whether the court properly concluded that the contractual language at issue supported an award of attorney's fees. As this claim requires an examination of the language of the sublease assignment agreement, our review is plenary. See *Cruz* v. *Visual Perceptions, LLC*, supra, 311 Conn. 101. The dispositive issue is whether the sublease assignment agreement provides for indemnification for third party claims only, or whether the language of that agreement also supports an award of attorney's fees between the contracting parties themselves.[17]

In *Amoco Oil Co.* v. *Liberty Auto & Electric Co.*, 262 Conn. 142, 810 A.2d 259 (2002), our Supreme Court noted the difference between an *action for indemnification* and a breach of contract claim. In that case, Liberty Auto & Electric Company (Liberty) contracted to install underground gasoline storage tanks for Amoco Oil Company (Amoco). Id., 144. Eight years later, one tank began to leak, and Amoco brought an "indemnification" claim against Liberty under the following contract provision: "Liability and Indemnity . . . [Liberty] shall reimburse [Amoco] for, and indemnify [Amoco] and

hold it harmless from and against any and all loss, costs (including reimbursement of all attorney fees and other costs of defense), damage, expense, claims (including claims of strict liability and for fault imposed by statutes, rules or regulations), suits and liability on account of any and all bodily injuries or death of any persons (including the employees of [Amoco], [Liberty], or its subcontractors) or damage to, or loss of destruction of any property (including without limitation, the work covered hereunder and the property of [Liberty], and subcontractors and [Amoco]) arising directly or indirectly out of or in connection with the performance of this Contract . . . ." (Footnotes omitted; internal quotation marks omitted.) Id., 144–45.

Liberty contended that the claim was not an action for indemnification, but rather, was a breach of contract action that was barred by the statute of limitations. Id., 146–47. In characterizing the *nature* of the claim for statute of limitations purposes, our Supreme Court observed that "[t]he logic and rationale underlying our indemnity case law are based on the premise that an *action for indemnification* is one in which one party seeks reimbursement from another party for losses incurred in connection with the first party's liability to a third party. In the present action, however, Amoco does not seek indemnification for losses arising from liability to a third party." (Emphasis added.) Id.,148–49. The court noted that "the concept of indemnity usually involves an indemnitor, A, and an indemnitee, B, who enter into a contract whereby A agrees to indemnify B for any money B becomes legally obligated to pay to a third party." (Emphasis omitted.) Id.,149.

Our Supreme Court determined that the claim raised by Amoco was not an *action for indemnification*: "Amoco cannot convert, for purposes of determining the applicable statute of limitations and accrual date, what otherwise is a breach of contract claim into an indemnification claim simply by labeling it as such in the pleadings. Although Amoco seeks 'indemnification' from Liberty in the first count of its complaint, Amoco effectively seeks enforcement of a specific contract provision that provides reimbursement for loss. Thus, the claim that Amoco asserts in count one of its complaint constitutes a breach of contract claim and, accordingly, [General Statutes] § 52-576 (a) furnishes the applicable statute of limitations." Id., 152. Because our Supreme Court determined that the action was barred by the statute of limitations, it never analyzed the merits of the breach of contract claim.

In *Total Recycling Services of Connecticut, Inc.* v. *Connecticut Oil Recycling Services, LLC*, Superior Court, judicial district of Middlesex, Docket No. CV-06-50000447-S (November 30, 2009), the trial court considered the motion of Connecticut Oil Recycling Services, LLC (Connecticut Oil) for attorney's fees based on an

agreement effecting the sale of the oil recycling business of Total Recycling Services of Connecticut, Inc. (Total Recycling) to Connecticut Oil. The operative provision stated: "[Total Recycling] agrees to indemnify and hold [Connecticut Oil] harmless from any costs or damages, including reasonable attorney's fees, resulting from any breach of any representation, warranty or covenant in this agreement." Id.

The court held that the provision had the "plain meaning" of obligating Total Recycling to compensate Connecticut Oil for any costs plus reasonable attorney's fees resulting from Total Recycling's breaches of the sales agreement. Id. The court denied the motion for attorney's fees, however, because it could not identify which attorney's fees were related to Connecticut Oil's prosecution of its breach of contract claims. Id. The denial of the motion was appealed, and it was affirmed by this court. See *Total Recycling Services of Connecticut, Inc.* v. *Connecticut Oil Recycling Services*, LLC, 129 Conn. App. 296, 305, 20 A.3d 716 (2011), rev'd, 308 Conn. 312, 63 A.3d 896 (2013). Our Supreme Court reversed this court's judgment, however, and determined that when some contractual provisions call for recovery of attorney's fees and others do not, a party is entitled to recover all reasonable fees "if apportionment is impracticable because the claims arise from a common nucleus and are intertwined." *Total Recycling Services of Connecticut, Inc.* v. *Connecticut Oil Recycling Services., LLC*, 308 Conn. 312, 333, 63 A.3d 896 (2013). Our Supreme Court never analyzed the trial court's interpretation of the contract.

On the basis of our review of the existing case law, our Supreme Court has decided that *an action for indemnification* is "one in which one party seeks reimbursement from another party for losses incurred in connection with the first party's liability to a third party." *Amoco Oil Co.* v. *Liberty Auto & Electric Co.*, supra, 262 Conn. 148. Less clear, however, is whether contractual language like in the present case that utilizes the phrase "indemnify and hold . . . harmless," is limited to *an action for indemnification*, or whether that language may support a claim between the contracting parties.

Our review of the relevant case law does not suggest that the language is talismanic and automatically dictates that the provision allows only an action for indemnification limited to the coverage of only third party claims. Rather, "[i]n reviewing a claim that attorney's fees are authorized by contract, we apply the well established principle that [a] contract must be construed to effectuate the intent of the parties, which is determined from [its] language . . . interpreted in the light of the situation of the parties and the circumstances connected with the transaction." (Internal quotation marks omitted.) *Total Recycling Services of Connecticut, Inc.*

v. *Connecticut Oil Recycling Services, LLC*, supra, 308 Conn. 327. "[T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the [writing]." (Internal quotation marks omitted.) *Connecticut National Bank* v. *Rehab Associates*, 300 Conn. 314, 319, 12 A.3d 995 (2011).

In this case, on the basis of our plenary review, we conclude that the plain language of the sublease assignment agreement supports the plaintiffs' contention that the provision is not limited to third party claims. According to Black's Law Dictionary, "to indemnify" is "[t]o reimburse (another) for a loss suffered because of a third party's *or one's own act or default.*" (Emphasis added.) Black's Law Dictionary (9th Ed. 2009); see also 1 D. Dobbs, Law of Remedies (2d Ed.1993), § 3.10 (3), p. 402 (indemnity and hold harmless agreements "often provide that one of the parties will protect the other from litigation costs or claims brought by third persons as well as from claims between themselves").

Given the broad language of the sublease assignment agreement, which by its own terms is not expressly limited to third party claims, we conclude that the provision allows for the recovery of attorney's fees arising from the defendant's breach of the restrictive covenant. The language clearly provides in relevant part: "[Holiday Inn] agrees to and does hereby indemnify and hold [BRS] harmless hereunder from all . . . losses . . . expenses and costs including, but not limited to, reasonable attorney's fees and expenses, arising out of . . . [Holiday Inn's] failure, from and after the delivery of this instrument, to observe, perform, and discharge . . . *each and every one of the covenants . . . assumed by [Holiday Inn] in this instrument . . . .*" (Emphasis added.)

This interpretation is consistent with the circumstances of the parties, the nature of the restrictive covenant, and the foreseeable claims that might accrue under the sublease assignment agreement. If we were to adopt the defendant's interpretation, we would be, in effect, judicially grafting a limitation that is not supported by the plain language of the indemnification provision nor our case law.[18]

Moreover, the defendant's interpretation would render portions of the indemnification provision superfluous. We have long held that "[t]he law of contract interpretation militates against interpreting a contract in a way that renders a provision superfluous." *United Illuminating Co.* v. *Wisvest-Connecticut, LLC*, supra, 259 Conn. 674. The indemnification provision clearly encompasses "expenses . . . arising out of . . . [Holiday Inn's] failure . . . to observe . . . each and every one of the covenants . . . assumed by [Holiday Inn]

in this instrument . . . ." Among the covenants and obligations undertaken by Holiday Inn in the "instrument" was the restrictive covenant. In its memorandum of decision, the trial court pragmatically observed that "it is hard to envision anybody but BRS being injured by a breach of [the restrictive] covenant because it was BRS' interest in protecting the position of the neighboring Marriott hotel that was the reason for including the covenant in the agreements." We agree. Only the plaintiffs could be injured by a breach of the restrictive covenant. Therefore, limiting that provision to encompass only third party claims is illogical with respect to the restrictive covenant because no third party could ever reasonably claim to be injured by the defendant's breach of the restrictive covenant.

Given the broad language of the indemnification provision and the absence of any indication that it was limited to third party claims, we conclude that the provision is not limited to third party claims, and that it provides for an award of attorney's fees between the plaintiffs and the defendant for a breach of the restrictive covenant.

B

The defendant claims, as it did in the trial court, that "it did not breach any assumed obligation to warrant an award of attorney's fees and expenses." Specifically, the defendant argues that "the restrictive covenant was not one of the assumed obligations arising out of the sublease . . . [but rather] was a new, additional covenant that was inserted only into the [sublease assignment agreement], and never incorporated into the sublease itself."

This claim is not persuasive. We agree with the trial court that "[t]his is an unconvincing and tortuous interpretation of the subject contracts." It is manifestly clear that the language of the sublease assignment agreement provided for the award of costs "arising out of" the failure to "perform . . . the covenants . . . assumed by [Holiday Inn] *in this instrument* . . . ." (Emphasis added.) Because the restrictive covenant was included in the sublease assignment agreement, the argument that the restrictive covenant was somehow not an assumed obligation thereunder is entirely without merit.

C

Finally, the defendant claims that the plaintiffs lacked standing to pursue a claim for attorney's fees. The defendant claims that the plaintiffs were not parties to contracts that gave rise to the claim for attorney's fees, and that they did not actually pay any of the attorney's fees or litigation costs in this case.

Although the plaintiffs were not parties to the sublease assignment agreement that supported the court's award of attorney's fees, we already have determined

that the right to enforce the restrictive covenant passed to the plaintiffs as the former members of BRS upon that entity's dissolution. The defendant has failed to demonstrate why the sublease assignment agreement could not also be enforced by the plaintiffs after it passed to the plaintiffs as an asset of BRS.

The defendant argues, finally, that the plaintiffs never actually paid for the attorney's fees and litigation costs that were awarded by the trial court. This claim rests on the fact that all of the plaintiffs' litigation costs were actually paid for by HD Hotel. This claim fails insofar as HD Hotel's members are comprised of the plaintiffs. The plaintiffs' respective share of ownership of HD Hotel is very similar to that of BRS. Accordingly, it is clear that the subject legal expenses were apportioned among the plaintiffs, and that any expense paid by HD Hotel was ultimately borne by the plaintiffs as its members. The defendant's claim fails.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The plaintiffs are four business entities owned by three families: HD Hotel, whose members are Heyman, owned by the Heyman family; AIM, owned by the Meyer family; and TRJ, owned by the Jabara family. In this opinion, we refer to Heyman, AIM, and TRJ, collectively as the plaintiffs, and by name where appropriate. HD Hotel, although a plaintiff, will be referred to by name.

[2] Specifically, the defendant contends that a restrictive covenant that was included in a sublease assignment agreement was merged out of existence when the sublease was merged with the ground lease.

[3] In 1994, the plaintiffs purchased the Marriot and operated the hotel as HD Hotel. In 1996, the plaintiffs purchased the Ramada Inn, and operated that hotel as BRS Realty Associates, LLC (BRS). Heyman, AIM, and TRJ were members of both BRS and HD Hotel.

[4] According to Jabara, an upscale hotel features more amenities and a higher level of service. Typically, upscale hotels feature a doorman, ballroom, pool, restaurant, and twenty-four hour room service. A midscale hotel, on the other hand, such as a Holiday Inn, would have fewer services and focus on the budget conscious traveler.

[5] The trial court found that Holiday Inn operates three levels of hotels: Crowne Plaza (upscale), Holiday Inn (midscale), and Holiday Inn Select (focus on value).

[6] In 1996, Holiday Inn was a wholly owned subsidiary of Bass PLC, a British public limited company.

[7] The transactional documents relative to the sale of the premises included four documents whose nomenclature is similar. For clarity, these documents will be referred to as follows. The overall transaction was governed by a Purchase and Sales Agreement (purchase and sales agreement). The transfer of the sublease interest in the premises from BRS Realty Associates, LLC (BRS) to Holiday Inn was accomplished by way of an Assignment and Assumption of Sublease Agreement (sublease assignment agreement). The conveyance of the fee interest from BRS to Holiday Inn was executed by way of a Limited Warranty Deed (limited warranty deed). The transfer of the ground lease from BRS to Holiday Inn was completed by an Assignment and Assumption of Lease Agreement and of Sublease Agreement (ground lease assignment agreement).

[8] The hotel structure and improvements were on two parcels of land. The structure itself rested on a large parcel. This parcel was subject to a ground lease in favor of TK Associates under which the plaintiffs held a sublease interest. The front landscape of the hotel was on a smaller parcel, which the plaintiffs held in fee simple.

[9] The trial court found that pursuant to Delaware law, which governed both the Holiday Inn-Bristol Hotel Company merger and the Bristol Hotel Company-FelCor Lodging Trust merger, "a surviving corporation shall be subject to all 'restrictions, disabilities and duties of each of such corporations

so merged . . . .' " On appeal, the trial court's finding is not challenged.

[10] In the third count, the plaintiffs and HD Hotel sought an injunction ordering the defendant to record a document on the Stamford land records cancelling the termination document that the defendant filed on the land records in 2006. This count was withdrawn when the restrictive covenant lapsed in 2011.

[11] Although a formal judgment had not been rendered when this appeal was filed, the defendant has nonetheless appealed from a final judgment insofar as at the time the appeal was taken the court had adjudicated the entirety of the plaintiffs' complaint. See Practice Book § 61-2 (judgment rendered on entire complaint is final judgment).

[12] General Statutes § 34-210 provides: "Upon the winding up of a limited liability company, the assets shall be distributed as follows: (1) Payment, or adequate provision for payment, shall be made to creditors, including, to the extent permitted by law, members who are creditors, in satisfaction of liabilities of the limited liability company; (2) unless otherwise provided in writing in an operating agreement, to members or former members in satisfaction of liabilities for distributions under sections 34-158 and 34-159; and (3) unless otherwise provided in writing in an operating agreement, to members and former members, first, for the return of their contributions and second, respecting their membership interests, in proportions in which the members share in distributions under section 34-158."

[13] In *Mukon* v. *Gollnick*, supra, 151 Conn. App. 132, a panel of this court stated: "The dissolution of a limited liability company does not . . . result in the automatic transfer of the limited liability company's assets to one of the individual members. Instead, the dissolution necessitates a prescribed winding-up process, and a member receives the limited liability company's property if, and only if, the member or manager winding-up the limited liability has completed the applicable steps established by [the winding-up statute]."

This language does not supplant the general rule that after dissolution *and completion of the winding-up process* the assets of a limited liability company devolve to its members. *In Mukon*, we held that an asset of a limited liability company did not transfer automatically and immediately at the moment a limited liability company was dissolved because the subject company had not completed the winding-up process, which in that case involved the payment of deferred taxes. The present case is distinguishable from *Mukon* insofar as BRS had been properly wound up, e.g., its liabilities were satisfied, and its remaining assets thereafter devolved to its members.

[14] The restrictive covenant provided: "Assignee by acceptance of this Assignment covenants and agrees that it will neither operate nor permit the operation of an 'upscale hotel' on premises herein conveyed. 'Upscale hotel' as used herein shall mean a hotel which caters to an upscale market, including, without limitation, hotels currently catering to an upscale market such as Marriot Hotels, Sheraton Hotels, Hilton Hotels, Omni Hotels, Crowne Plaza, Wyndham Hotels, DoubleTree Hotels and Suites, and Embassy Suites. This restriction shall not prevent Assignee from operating or permitting the operation of a Holiday Inn Hotel, a Holiday Inn Select Hotel, a Holiday Inn Express Hotel, a Radisson Hotel, or other hotels catering to the same market currently served by these hotels. This restriction is intended to run with the land and shall be binding upon Assignee, its successors and assigns. This restriction shall expire fifteen (15) years from the date of this Assignment."

[15] According to Levine, BRS had a right of first refusal under which it could purchase the ground lease from TK Associates. She testified that shortly before the plaintiffs and Holiday Inn executed the purchase and sales agreement, TK Associates informed the plaintiffs that a third party wanted to buy the ground lease. This forced the plaintiffs to decide whether to exercise the right of first refusal. The purchase and sales agreement was then amended to address the plaintiffs' potential acquisition of the ground lease.

Levine testified that the reason the ground lease was not acquired by the plaintiffs prior to the July 12, 1996 closing was that they did not want to purchase the ground lease before Holiday Inn had actually closed on the transaction, and also that they wanted to use the funds from the July 12, 1996 closing to purchase the ground lease from TK Associates.

[16] The plaintiffs claim a provision in the ground lease assignment agreement also supports an award of attorney's fees. That provision stated: "[Holiday Inn] hereby indemnifies and agrees to defend, and hold [BRS] harmless from all claims, demands, liabilities, damages, loses or judgments, including the defense thereto, including attorney's fees and expenses, made

against or suffered by [BRS] which relate to any obligation of [Holiday Inn] accruing, to be performed or arising out of events occurring on or after the date hereof with respect to the Lease, the Sublease or the Property."

The defendant has not claimed that there is any meaningful difference between the two provisions, and its arguments appear to apply equally to both the language of the sublease assignment agreement and the ground lease assignment agreement. Because we conclude that the sublease assignment agreement supports the trial court's award of attorney's fees, we need not examine the language of the ground lease assignment agreement in detail.

[17] We note significant disparity among our sister states as to whether language of indemnification covers losses between the contracting parties themselves, or only as between a contracting party and a third party. Compare *Hooper Associates, Ltd.* v. *AGS Computers, Inc.*, 74 N.Y.2d 487, 492, 548 N.E.2d 903, 549 N.Y.S.2d 365 (1989) ("inasmuch as a promise by one party to a contract to indemnify the other for attorney's fees incurred in litigation between them is contrary to the well-understood rule that parties are responsible for their own attorney's fees, the court should not infer a party's intention to waive the benefit of the rule unless the intention to do so is unmistakably clear from the language of the promise") with *Battelle Memorial Institute* v. *Nowsco Pipeline Services.*, Inc., 56 F. Supp. 2d 944, 951 (S.D. Ohio 1999) ("it is clear from both the Ohio and Sixth Circuit definitions of indemnification that a party wishing to narrow an indemnification clause to third party damage is obligated to limit the scope of the clause expressly; and absent such express limitation, indemnification clauses may apply to damage suffered by the contracting parties themselves").

[18] The defendant's claim that the indemnification provision does not support an award of attorney's fees between the parties rests on a misunderstanding of our Supreme Court's holding in *Amoco Oil Co.* In that case, the defendant contends, our Supreme Court stated "unequivocally that indemnification agreements apply to third party claims." As we have observed previously, *Amoco Oil Co.* was decided purely on a statute of limitations issue. Our Supreme Court never analyzed whether the language of the indemnification provision in that case could support an award of attorney's fees between the contracting parties, because even if such a claim was supported, the statute of limitations period for a breach of contract action had expired.

---